**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NOAH SYSTEMS, INC.,** | ) | |
| | ) | **Via ECF/Courtesy Copy** |
| **Plaintiff and** | ) | |
| **Counter-Defendant** | ) | |
| | ) | **Civil Action No. 06-cv-00933-AJS** |
| | ) | |
| | ) | |
| **vs.** | ) | **Honorable Arthur J. Schwab** |
| | ) | |
| **INTUIT INC.,** | ) | |
| | ) | |
| **Defendant and** | ) | |
| **Counter-Plaintiff.** | ) | |

**DEFENDANT INTUIT INC.'S OPENING CLAIM CONSTRUCTION BRIEF AND
MOTION FOR SUMMARY JUDGMENT OF INVALIDITY FOR INDEFINITENESS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

ARGUMENT .................................................................................................................... 5

I.   EVERY ASSERTED CLAIM OF THE '435 PATENT IS INVALID FOR
     INDEFINITENESS................................................................................................. 6

     A.   "first communication means for transferring said data inputs from said
          financial transaction computer to said file of said financial accounting
          computer" (claims 12, 52, 53 and 56)...................................................... 9

     B.   "means for providing access to said file of said financial accounting
          computer for said first entity and/or agents of said first entity so that said
          first entity and/or said agent can perform one or more activities selected
          from the group consisting of entering, deleting, reviewing, adjusting and
          processing said data inputs" (claims 12, 52, 53 and 56)...................................... 12

          1.   The "means for providing access" limitation is indefinite under
               Noah's proposed function ...................................................... 13

          2.   Intuit's proposed function for the "means for providing access"
               provides additional bases for indefiniteness of this limitation................. 14

     C.   "means for generating at least one accounting report from said data
          inputs" (claim 13) ............................................................................ 16

     D.   "means for transferring funds from said first entity to said second entity"
          (claim 15) ...................................................................................... 18

     E.   "means for electronically recording, collecting, processing, storing and
          transmitting said financial transactions" (claim 16) ............................................ 20

II.  INTUIT'S PROPOSED CONSTRUCTIONS SHOULD BE ADOPTED FOR
     THE DISPUTED TERMS AND LIMITATIONS.......................................................... 20

     A.   "financial accounting system" (claims 12, 52, 53, 54, 55, 56) ........................... 20

          1.   The term "financial accounting system," which appears only in the
               preambles of the asserted claims, should not serve as a limitation
               on the claims' scope............................................................. 21

          2.   Alternatively, Noah's attempt to limit the claimed "financial
               accounting system" to an "open" network should be rejected................. 22

     B.   "first entity" (claims 12, 29, 30, 31, 32, 38, 42, 43, 47, 49, 50, 51, 52, 53,
          56) .............................................................................................. 27

     C.   "financial accounting computer" (claims 12, 13, 14, 17, 31, 33, 34, 52, 53,
          54, 55, 56) ..................................................................................... 29

# TABLE OF CONTENTS
## (continued)

**Page**

D. "financial transaction computer" (claims 12, 40, 41, 52, 53, 56) ........................ 31

E. "data inputs" (claims 12, 42, 48, 49, 50, 51, 52, 53, 56) ..................................... 32

F. "electronically recorded financial transactions made between a said first entity and a second entity" (claims 12, 52, 53, 56)/"financial transactions" (claims 12, 33, 34, 38, 42, 53, 54, 55) .................................................................. 33

G. "first communication means for transferring said data inputs from said financial transaction computer to said file of said financial accounting computer" (claims 12, 47, 52, 53, 56) ............................................................... 34

    1. If the "first communication means" limitation is not found to be indefinite, its corresponding structure must include the elements identified in the reexamination's Statement of Reasons for Confirmation ........................................................................................... 35

    2. Noah's attempt to limit the corresponding structure for the "first communication means" to an "open" network should be rejected .......... 37

H. "means for providing access to said file of said financial accounting computer for said first entity and/or agents of said first entity so that said first entity and/or said agent can perform one of more activities selected from the group consisting of entering, deleting, reviewing, adjusting, and processing said data inputs" (claims 12, 48, 49, 50, 51, 52, 53, 56) .................... 38

I. "means for generating at least one accounting report from said data inputs" (claim 13) .................................................................................................. 39

J. "accrual accounting data inputs/accrual accounting" (claim 14) ........................ 39

K. "cash accounting data inputs/cash accounting" (claim 14) .................................. 41

L. "means for transferring funds from said first entity to said second entity" (claim 15) ................................................................................................................. 41

M. "transferring funds" (claim 15) ............................................................................. 43

N. "means for electronically recording, collecting, processing, storing and transmitting said financial transactions" (claim 16) ............................................. 44

O. processing ............................................................................................................... 44

P. "personal computer" (claim 17) ............................................................................ 46

Q. "telephone computer" (claim 17) .......................................................................... 46

R. "financial transaction codes" (claims 33, 54) ...................................................... 48

S. "for association with said financial transactions" (claims 33, 34, 54, 55) ........... 49

T. "standardized itemization code" (claims 34, 55) .................................................. 50

**TABLE OF CONTENTS**
**(continued)**

Page

U.    "second entity" (claims 35, 36, 37, 38, 43, 44, 45, 46, 47, 53) ........................... 51

V.    "merchant" (claims 35, 43, 44, 45) ........................................................... 52

W.    "financial institution" (claims 36, 40 ........................................................ 53

X.    "bank" (37, 41) .................................................................................... 53

Y.    "communication links between" (claim 47) ................................................ 54

Z.    "ledger file" (claim 53) .......................................................................... 54

AA.   "configured to receive" (claim 53) ......................................................... 55

BB.   "coupled via" (claim 53) ........................................................................ 56

CC.   "processing said data inputs" (claim 51) ................................................. 56

DD.   "cooperates with" (claim 56) .................................................................. 57

EE.   "coupled to" (claim 56) .......................................................................... 59

CONCLUSION ................................................................................................. 60

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Acumed LLC v. Stryker Corp.*,
   483 F.3d 800 (Fed. Cir. 2007)....................................................................................*passim*

*Allen Engineering Corp. v. Bartell Industries, Inc.*,
   299 F.3d 1336 ( Fed. Cir. 2002)................................................................................... 21

*Aristocrat Techs. Australia Pty. Ltd. v. Int'l Game Tech.*,
   521 F.3d 1328 (Fed. Cir. 2008)...................................................................................*passim*

*Asyst Technologies, Inc. v. Empak, Inc.*,
   268 F.3d 1364 (Fed. Cir. 2001)................................................................................... 7, 11

*Blackboard, Inc. v. Desire2Learn, Inc.*,
   574 F.3d 1371 (Fed. Cir. 2009)...................................................................................*passim*

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
   289 F.3d 801 (Fed. Cir. 2002)..................................................................................... 22

*CBT Flint Partners, LLC v. Goodmail Systems, Inc.*,
   No. 1:07-CV-3124-TWT, 2008 WL 3929808 (N.D. Ga. Aug. 20, 2008) ........................ 7, 54

*CytoLogix Corp. v. Ventana Medical Systems*,
   424 F.3d 1168 (Fed. Cir. 2005)................................................................................... 15

*Datamize, LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005)................................................................................... 6

*Erbe Elektromedizin GmbH v. Canady Technology, LLC*,
   512 F. Supp. 2d 297 (W.D. Pa. 2007)......................................................................... 6

*Finisar Corp. v. DirecTV Group, Inc.*,
   523 F.3d 1323 (Fed. Cir. 2008)................................................................................... 8, 16

*Fotomedia Techs., LLC v. AOL, LLC*,
   Nos. 2:07-cv-255, 2:07-cv-256, 2009 WL 2175845 (E.D. Tex. July 21, 2009) .................... 7

*Halliburton Energy Services, Inc. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008)................................................................................... 7

*Kara Tech. Inc. v. Stamps.com Inc.*,
   582 F.3d 1341 (Fed. Cir. 2009)................................................................................... 23

*NetMoneyIN, Inc. v. Verisign, Inc.*,
   545 F.3d 1359 (Fed. Cir. 2008)................................................................................... 6, 8, 16

*On Demand Machine Corp. v. Ingram Industries, Inc.*,
   442 F.3d 1331 (Fed. Cir. 2006)................................................................................... 21

*PSC Computer Prods., Inc. v. Foxconn Int'l*,
   355 F.3d 1353 (Fed. Cir. 2004)................................................................................... 46

*Schering Corp. v. Amgen Inc.*,
   222 F.3d 1347 (Fed. Cir. 2000)................................................................................... 47

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Schumer v. Lab. Computer Sys., Inc.,*
  308 F.3d 1304 (Fed. Cir. 2002)............................................................................... 22

*Sofamor Danek Group, Inc. v. DePuy-Motech, Inc.,*
  74 F.3d 1216 (Fed. Cir. 1996)................................................................................. 23

*Storage Tech. Corp. v. Cisco Systems, Inc.,*
  329 F.3d 823 (Fed. Cir. 2003).................................................................................. 21

*Touchcom, Inc. v. Dresser, Inc.,*
  427 F. Supp. 2d 730 (E.D. Tex. 2005) .................................................................. 9, 15

*William P. Young v. Lumenis, Inc.,*
  492 F.3d ........................................................................................................... *passim*

### STATUTES

35 U.S. C. 112...................................................................................................... 27, 36, 37

35 U.S.C. § 112 ¶ 2................................................................................................... 6, 60

35 U.S.C. § 112 ¶ 6................................................................................................ *passim*

### OTHER AUTHORITIES

AMERICAN HERITAGE DICTIONARY at 269, 293 (1980) .............................................. 59

IBM Dictionary of Computing (IBM 1991) ............................................................... 58

## INTRODUCTION

In its Opening Claim Construction Brief, plaintiff Noah Systems, Inc. ("Noah") appears reluctant to provide much of a target.  Although the parties have fully briefed claim construction issues once already (before this action was stayed pending reexamination), and although the parties exchanged and discussed their claim construction positions weeks before Noah's brief was filed, Noah does nothing to engage on positions it has long known Intuit would advance. Instead, Noah's brief largely reiterates Noah's proposed constructions and fills much of its 58 pages with voluminous block quotes from the specification and prosecution history of the patent-in-suit.  Even the sections labeled "Argument" in Noah's brief do nothing more than repeat Noah's proposed constructions of the disputed claim limitations.

Unlike Noah, Intuit does not have the luxury of being able to save its ammunition for the reply brief.  Accordingly, Intuit uses this brief to address the arguments it believes Noah will eventually make, and to raise affirmative arguments that Intuit believes should dispose of this action entirely.  Specifically, Intuit first argues that five means-plus-function limitations recited in the asserted claims of the patent-in-suit are all indefinite because the patent fails to disclose the "corresponding structure" statutorily required for claims written in that form.  This deficiency renders every asserted claim invalid and justifies complete summary judgment of invalidity in Intuit's favor.[1]

Second, Intuit advances the correct constructions of the disputed claim limitations and rebuts Noah's meritless attempts to alter claim scope.  Often, Noah's efforts aim at narrowing the asserted claims in a vain attempt to avoid invalidating prior art.  For example, Noah twice attempts to insert the requirement for an "open" network into the claims of the patent-in-suit,

---

[1] As discussed below, claim construction is the appropriate point in the process for courts to consider summary judgment of invalidity due to indefiniteness.

apparently for that purpose, even though the word "open" appears nowhere in the patent, and

Noah's proposed limitation was expressly rejected during reexamination.  Such attempts by

Noah should not succeed, and Intuit's proposed constructions should be adopted.

## BACKGROUND

### I.     THE PATENT-IN-SUIT

Noah alleges that Intuit's QuickBooks and Quicken products infringe claims 12-17, 29-

38, and 40-56 of U.S. Pat. No. 5,875,435 ("the '435 Patent").  Filed on May 18, 1998, the '435

Patent relates to an "automated accounting system which brings together in a connected or

network fashion, all the various entities that are involved with financial transactions between a

first entity, such as a business or individual, and other entities such as merchants, financial

institutions and the like."  '435 Patent at 3:16-20.  The first entity, or user of the automated

accounting system, establishes a file called a master ledger at a host or central computer.  *Id.* at

3:26-30.  Each of the other entities, *i.e.* the merchants, financial institutions, ATMs, etc., has a

transaction computer that includes a subsidiary ledger for recording financial transactions

conducted with that particular entity.  *Id.* at 3:66-4:10.  The other entities store, process, collect

and transmit the financial transaction data related to transactions conducted between that entity

and a particular user to the user's master ledger.  *Id.* at 4:13-20.  The master ledger receives and

stores data related to electronically recorded financial transactions between the user and other

entities with which the user conducts transactions.  *Id.* at 3:26-30.

Associated with each of these subsidiary ledgers is an automatic coding device for

assigning codes to financial transaction data to identify methods for transferring funds and the

accounting treatment for the transaction.  '435 Patent at 4:10-14, 5:17-23.  For example, if a

contractor were purchasing a window from a window supplier, the standardized code may

identify the type of item purchased, the anticipated use category of that item, the specific job for

which the inventory was purchased, and any depreciation and expense parameters.  *Id.* at 9:9-12.

All entities in the system use a "common language" to enable all computers in the system to

communicate processing instructions and utilize the standardized codes.  *Id.* at 2:26-34.  The

common language instructions and standardized codes include transaction processing

instructions, accounting rules and standard calculations, funds transfer instructions and codes,

individual system network instruction codes, and financial accounting codes, among others.  *Id.*

at 4:20-32.  The common language and standardized codes instruct the computers at various

entities how to process and report the transaction data.  *Id.* at 9:13-20.  *See* 9:40-10:17.  For

example, in the case of the window purchase, the common language and standardized codes

instruct the contractor's accounting system to record the window as an inventory asset, set up the

depreciation schedule, deduct the window cost from the cash account, and allocate the purchase

against a particular job account among other possibilities.  *Id.* at 9:40-10:17.

Periodically, the subsidiary ledgers transfer financial transaction data including the

standardized codes to each user's master ledger.  '435 Patent at 6:9-14.  After the transaction

data is processed by the user's system using the common language and standardized codes, users

can manually adjust the data in the master ledger via entry of an authorized passcode.  *Id.* at

6:19-37.  Users can also generate reports automatically using the common language and

standardize codes.  *Id.* at 2:40-55.

## II.     THE PROSECUTION AND REEXAMINATION OF THE '435 PATENT

The use of a "common language" was not part of the original patent application to which

the '435 Patent claims priority.  As first filed on November 28, 1994, the parent application to

the '435 Patent did not include a single mention of a common language.  Exhibit A (U.S. Patent

Application S/N 08/313,988) (the "parent application"); *see also* Noah Brief, Exh. C (underlined

material indicates 1998 additions).  Although Noah incorrectly asserts that the disclosure of a

common language appears in the original 1994 parent application, *see* Noah Brief at 1, that concept was not in fact added until the new, continuation-in-part ("CIP") application was filed in May 1998.  *Id.*; Exhibit B ('435 File History, May 18, 1998 Application).  Lacking any mention of common language, the claims of the 1994 parent application were repeatedly rejected, and the applicant was unable to obtain allowance, even after an appeal to the Board of Patent Appeals, which affirmed the examiner's rejection of all pending claims.  *See* Exhibit C ('988 Patent File History, BPAI Decision).  The applicant subsequently abandoned the 1994 parent application. *Id.*, Exhibit D (November 19, 2001 Abandonment).

Prior to that abandonment, the applicant filed the 1998 CIP application, which eventually issued as the '435 Patent.  Exhibit B ('435 File History, May 18, 1998 Application). Unlike a "continuation" application, a "continuation-in-part" or "CIP" application includes new subject matter that did not appear in the earlier application.  *See* Manual of Patent Examining Procedure § 201.08 (8th Ed, 2008).  In this case, the applicant specifically added descriptions referring for the first time to the use of a "common language."  For example, Exhibit 2 to Noah's brief contains a draft application that was shared with the examiner during a May 5, 1998 interview. Page 6 of the draft application shows via underlining the text proposed to be added to the new application, including "to facilitate the computation and reporting of one or more common language instructions and standardized transaction codes . . . ."  Noah Brief, Exhibit 2 at 6.  The public will never know exactly what was discussed at that interview because there is no record of it in the file histories[2]; however, as a result of that discussion, the applicant added several more

_____

[2] Although Noah's Brief refers to a May 5, 1998 Interview Summary, no such summary exists and there are no entries in the '988 Application File History or '435 Patent File History recording an interview on May 5, 1998.  Rather, the text Noah quotes as being from the May 5, 1998 interview summary is actually from a May 22, 1997 Interview Summary the examiner attached to a Final Office Action of the same date.  *See* Exhibit G ('988 File History, May 22, 1997 Final

references to "common language" prior to filing the 1998 CIP application that issued as the '435

Patent.  *See* '435 Patent at 2:28-32; 4:20-32; 9:13-19; 9:26-34; 10:6-12; 10:35-39.

In 2006, the Patent and Trademark Office granted a request to reexamine the '435 Patent.

The claims of the '435 Patent were repeatedly rejected until the applicant filed an appeal to the

Board of Patent Appeals.  Exhibit S ('435 Reexamination File History, Appeal Brief).  In the

appeal brief, the applicant distinguished his invention from the prior art on the basis of the

common language and standardized codes.  *Id.*  During the appeal, the examiner agreed to allow

the claims on the condition that the "first communication means" include the use of a common

language to communicate processing instructions along with financial data to distinguish the

claimed invention that from prior art systems.  Exhibit F at 4 ('435 Reexamination File History,

Statement of Reasons for Confirmation) ("claim 12 . . . includes the following key features . . . a

common language use by both the financial accounting computer and the financial transaction

computer to enable the computers to communicate processing instructions and utilize

standardized transaction codes.").

## **ARGUMENT**

Intuit's argument is divided into two parts.  The first part asserts that certain "means-

plus-function" limitations of the asserted claims of the '435 Patent are not susceptible to

construction, because the patent's specification fails to disclose the requisite "corresponding

structure" for performing the function recited in those limitations.  Accordingly, those claims are

invalid as indefinite, and Intuit concurrently moves for summary judgment of invalidity on those

grounds.  The second part contains Intuit's positions concerning constructions of all disputed

Office Action) (cover sheet indicating attached interview summary and summary itself).

claim limitations.[3]

## I.    EVERY ASSERTED CLAIM OF THE '435 PATENT IS INVALID FOR INDEFINITENESS

Every asserted claim of the '435 Patent is invalid because each one fails to satisfy the "definiteness" requirement – the requirement for "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  35 U.S.C. §112 ¶2.  A single indefinite limitation invalidates an entire claim.  *NetMoneyIN, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1366-67 (Fed. Cir. 2008).  In addition, because a dependent claim effectively incorporates the limitations of the independent claim from which it depends, an indefinite limitation in an independent claim also invalidates all of that claim's dependent claims.  *See, e.g.*, *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1356 (Fed. Cir. 2005) ("'Aesthetically pleasing,' as it is used in the only independent claim of [the patent-in-suit], fails to 'particularly point[ ] out and distinctly claim [ ] the subject matter which the patentee regards as his invention' . . . . We therefore affirm the district court's grant of summary judgment of invalidity of all claims . . . .").  In this case, each asserted claim contains at least two indefinite limitations, and some dependent claims contain even more.  Thus, all asserted claims are invalid.

The question of claim indefiniteness is a legal conclusion, which is "drawn from the court's duty as the construer of patent claims."  *Datamize*, 417 F.3d 1342, 1347 (Fed. Cir. 2005).  Courts therefore routinely address the asserted indefiniteness of claim limitations during claim construction.  *See, e.g.*, *NetMoneyIN*, 545 F.3d at 1364; *Erbe Elektromedizin GmbH v. Canady Technology, LLC*, 512 F. Supp. 2d 297, 313 (W.D. Pa. 2007).  The reason is logical – if a claim limitation is indefinite, it is incapable of having a construction.  When that happens, courts

---

[3] The second part also includes a discussion of corresponding structure that must be included in any construction of certain means-plus-function limitations that Intuit contends are invalid as indefinite.

typically grant summary judgment of invalidity of such claims in their claim construction orders. *See, e.g.*, *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1373 (Fed. Cir. 2009) ("After a *Markman* hearing, the district court entered partial summary judgment for Desire2Learn, holding claims 1-35 of the patent invalid for indefiniteness."); *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1247 (Fed. Cir. 2008). Indeed, courts often simply find claim limitations indefinite as a matter of law in their claim construction orders without characterizing the ruling as a summary judgment order at all. *See, e.g.*, *Fotomedia Techs., LLC v. AOL, LLC*, Nos. 2:07-cv-255, 2:07-cv-256, 2009 WL 2175845, at *19-20 (E.D. Tex. July 21, 2009); *CBT Flint Partners, LLC v. Goodmail Systems, Inc.*, No. 1:07-CV-3124-TWT, 2008 WL 3929808, at *7, *9 (N.D. Ga. Aug. 20, 2008). Thus, to the extent the Court deems such a motion necessary, Intuit hereby moves for summary judgment of indefiniteness and respectfully requests that this issue be addressed during claim construction in any event.

The principal indefinite limitations of the '435 Patent are drafted in "means-plus-function" format.[4] Such limitations recite a "means" for performing a specified "function." 35 U.S.C. §112 ¶6. The first step of the claim construction analysis for such claims is to "identify the function explicitly recited in the claim." *Asyst Technologies, Inc. v. Empak, Inc.*, 268 F.3d 1364, 1369 (Fed. Cir. 2001). The recited "means" must then be construed to cover the "corresponding structure" described in the patent's specification for performing the recited function and any equivalents thereof. *Id.* However, if no such "corresponding structure" is described in the specification, or even if the disclosed corresponding structure is not "clearly linked" to the recited function, the means-plus-function limitation is indefinite and all claims in which it appears (directly or by dependency) are invalid. *Blackboard*, 574 F.3d at 1382.

---

[4] Several other limitations are indefinite for other reasons. They are discussed below in the sections addressing the constructions of those limitations.

In cases involving a "computer-implemented invention," the disclosed corresponding structure for a means-plus-function limitation must be "more than simply a general purpose computer or microprocessor." *Aristocrat Techs. Australia Pty. Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Rather, it must be a "special purpose computer programmed to perform the disclosed algorithm" for performing the recited function. *Id.* If no such algorithm is disclosed, then as the Federal Circuit has held in several recent cases, there is no corresponding structure, and the claim is indefinite. *See, e.g.*, *Blackboard*, 574 F.3d at 1382-85; *NetMoneyIN*, 545 F.3d at 1367; *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340-41 (Fed. Cir. 2008); *Aristocrat*, 521 F.3d at 1333-38.

A total of five claim limitations in the asserted claims of the '435 Patent are invalid for this reason. Two of the indefinite means-plus-function limitations appear in every asserted independent claim of the '435 Patent (claims 12, 52, 53 and 56), and thus invalidate those claims, plus all asserted dependent claims:

- "first communication means for transferring said data inputs from said financial transaction computer to said file of said financial accounting computer" and

- "means for providing access to said file of said financial accounting computer for said first entity and/or agents of said first entity so that said first entity and/or said agent can perform one or more activities selected from the group consisting of entering, deleting, reviewing, adjusting and processing said data inputs"

Because each of these limitations is indefinite, each one independently renders all asserted claims of the '435 Patent invalid.

Other indefinite means-plus function limitations appear in dependent claims:

- "means for generating at least one accounting report from said data inputs" (claim 13)

- "means for transferring funds from said first entity to said second entity" (claim 15) and

- "means for electronically recording, collecting, processing, storing and transmitting said financial transactions" (claim 16)

Each of these indefinite limitations renders the claim in which it appears invalid.

A.   **"first communication means for transferring said data inputs from said financial transaction computer to said file of said financial accounting computer" (claims 12, 52, 53 and 56)**

The parties agree that the function recited for the "first communication means"[5] limitation is "transferring the data inputs from the financial transaction computer to the file of the financial accounting computer." Noah asserts that the corresponding structure is an "open network" which includes, *inter alia*, "communication links" between the two computers and "a modem or other data transfer equipment for communicating over the network." Noah Brief at 17. While certain portions of such equipment may be necessary for transferring data from one computer to the other, Noah's proposed construction omits any structure for performing another essential portion of the recited function: Like the patent itself, Noah's construction fails to disclose a computer programmed with any algorithm for transferring the data inputs "to the file" of the financial accounting computer. The structure upon which Noah relies, at most, merely picks up the data where the financial transaction computer connects to the network and drops it off where the network connects to the financial accounting computer. The data is then left forlornly on the threshhold, with no algorithm disclosed for transferring it to the file recited in the claims.

This deficiency invalidates each claim in which this limitation appears (i.e., all asserted claims). A patent specification must disclose sufficient structure for performing the **entire** recited function; disclosing structure for performing only part of that function is not enough. *See, e.g.*, *Touchcom, Inc. v. Dresser, Inc.*, 427 F. Supp. 2d 730, 736 (E.D. Tex. 2005) (finding

---

[5] It is unclear why the word "first" appears in the claim, since no "second" communication means is recited.

means-plus-function limitation invalid because the identified structure was "insufficient to perform the entire function found in the claim language").  Because the specification of the '435 Patent fails to satisfy this requirement, this claim limitation is indefinite.

Although the indefiniteness of this limitation was raised in previous briefing before this action was stayed, Noah's opening brief provides no discussion of any disclosed algorithm for performing the missing portion of the limitation.  *See* Noah Brief at 18-21.  It does, however, make reference to portions of the specification that Noah may later attempt to rely upon.  Specifically, the long quotes from the specification in Noah's brief include the following three disclosures:

- Box 106 of Figure 2, which states, "establish communication links with master ledger and external sources"

- Box 170 of Figure 2, which states, "periodic transfer of data ledger to master ledger"

- Box 40 of Figure 1, which states, "enter updates from subsidiary automated ledger(s)"

However, the first disclosure (box 106) describes a step that must occur **before** the recited function of "transferring said data inputs" is performed.  The third disclosure (box 40) describes a step that occurs **after** that function is performed.  The second disclosure (box 170) **merely discloses the recited function itself**, without providing any algorithm for performing it.  Thus, there is no disclosure of the algorithm that constitutes the corresponding structure for this limitation.

While the step in box 106 establishes a communication link over which data may later be transferred, that is not sufficient to make it part of the required algorithm.  The corresponding

structure in a means-plus-function limitation "must actually perform the function, not merely enable the pertinent structure to operate as intended."  *Asyst*, 268 F.3d at 1371 ("An electrical outlet enables a toaster to work, but the outlet is not for that reason considered part of the toaster.").  Although the establishment of a communication link may enable the system to later perform the claimed function of transferring data inputs to the file on the financial accounting computer, the establishment of such links does not itself perform that function:  It is the electrical outlet, not the toaster.

Nor is box 40's step of entering updates from the subsidiary ledgers part of the requisite algorithm.  The system reaches box 40 via line 33, which connects in turn to line 171 from Figure 2.  Line 171 comes from box 170, which describes the action of performing a "periodic transfer of data ledger[6] [sic] to master ledger."  The step of "transferring said data inputs" therefore occurs in box 170, **before** the system invokes the "entering updates" step from box 40.  Thus, the step described in box 40 also cannot be part of the algorithm for performing the recited function.

Finally, the step described in box 170 and the accompanying text from the specification merely recites the claimed function of "transferring said data inputs."  Specifically, the specification describes this step as follows:  "The system then proceeds by line 161 to box 170 where the periodic transfer of data inputs from the subsidiary ledger to the master ledger is set forth."  '435 Patent at 6:9-11.  Such mere repetition of the recited function fails to provide the necessary description of an algorithm that shows **how that function is to be performed** and amounts at best to "pure functional claiming" – insufficient to disclose any corresponding

---

[6] The reference to "data ledger" in box 40 appears to be a typographical error.  The corresponding text in the specification describes the step as "the periodic transfer of "data inputs," not of "data ledger."

structure.  *See Aristocrat*, 521 F.3d at 1334-38.  Thus, Noah cannot rely on any of the three disclosures discussed above to locate the absent algorithm.

Nor can Noah evade the definiteness requirement by asserting that one of ordinary skill in the art could have figured out how to transfer the data from the threshold between the network and the financial accounting computer to the file that resides on that computer.  Such an argument incorrectly "conflates the requirement of enablement under section 112 paragraph 1 and the requirement to disclose the structure that performs the claimed function under section 112 paragraph 6."  *Aristocrat*, 521 F.3d at 1336-37; *see also, e.g., Blackboard*, 1385 F.3d at 1384-85.  Indeed, the fact that "ordinarily skilled artisans could carry out the recited function in a variety of ways is precisely why claims written in 'means-plus-function' form must disclose the particular structure that is used to perform the recited function."  *Blackboard*, 1385 F.3d at 1385.  Where, as here, no such structure is disclosed, the patentee has impermissibly "attempted to capture any possible means for achieving that end," and the requirements of section 112 paragraph 6, which are "intended to prevent such pure functional claiming," prohibit such an attempt.  *Id.*  Thus, Noah cannot salvage the validity of this limitation (or any of those discussed below) through such a misplaced enablement argument.

    **B.**    **"means for providing access to said file of said financial accounting computer for said first entity and/or agents of said first entity so that said first entity and/or said agent can perform one or more activities selected from the group consisting of entering, deleting, reviewing, adjusting and processing said data inputs" (claims 12, 52, 53 and 56)**

The specification of the '435 Patent also discloses insufficient corresponding structure for the other means-plus-function limitation found in the independent claims.  Although the parties disagree concerning the recited function for the "means for providing access…" limitation, this limitation is indefinite even under Noah's proposed construction of that function.  Thus, for the sake of simplicity, the indefiniteness discussion will proceed first under Noah's proposed

construction of the recited function.  Intuit's proposed construction of that function, which

provides additional bases for the indefiniteness of the claim, is discussed below.

        1.        **The "means for providing access" limitation is indefinite under Noah's proposed function.**

Noah's proposed construction for the recited function is "providing access to the file of

the financial accounting computer for the first entity and/or agents of the first entity so that the

first entity and/or the agent can perform one or more activities selected from the group consisting

of entering, deleting, reviewing, adjusting and processing the data inputs."  Noah Brief at 24.

According to Noah, the corresponding structure is[7] "the financial accounting computer, as

defined above, which is programmed to allow access to files on the computer upon entry of a

passcode."  *Id.*  In other words, in Noah's view, the corresponding structure for the "means for

providing access" limitation is a **<u>computer</u>**, which is **<u>programmed to allow access</u>** to files when

a **<u>user</u>** enters a passcode.  However, the specification fails to satisfy the requirement for

disclosing a particular **<u>algorithm</u>** with which the computer is "programmed" to allow such

access.  Accordingly, as with the "first communication means" limitation, this limitation also

renders all asserted claims indefinite.

Noah's asserted corresponding structure is analogous to the structure that the Federal

Circuit recently rejected as insufficient in the *Aristocrat* case.  *See* 521 F.3d at 1331-1338.  In

*Aristocrat*, the patentee Aristocrat asserted that the corresponding structure for the disputed

"game control means" was a "standard microprocessor-based gaming machine" (i.e., a computer)

with "appropriate programming."  *Id.* at 1331.  The Federal Circuit held that "'appropriate

programming' simply references a computer that is programmed so that it performs the function

---

[7] Noah's brief actually asserts that the corresponding structure "includes" the financial
accounting computer, but since Noah identifies no other corresponding structure, either in its
brief or in the parties' Joint Statement, Noah should not be permitted any eleventh-hour additions
of alleged structure.

in question." *Id.* at 1334.  The court concluded that such an asserted construction "simply describes the function to be performed, not the algorithm by which it is performed" and therefore cannot satisfy the requirements of section 112 paragraph 6.  *Id.* at 1334-1338.

Noah's asserted structure for the "means for providing access" limitation suffers the same deficiency.  Here, Noah asserts that the function to be performed is "providing access to the file" recited in the claims.  Noah's structure is merely a "computer programmed to allow access" to the file when a passcode is entered.  Thus, as in *Aristocrat*, Noah's proposed structure merely "describes the function to be performed, not the algorithm by which it is performed" and therefore fails to preserve the claim's validity.

Noah cannot avoid this result by tacking the phrase "upon entry of a passcode" onto the proposed corresponding structure.  First, such a reference to a passcode provides no information concerning the missing algorithm with which the computer must be programmed in order to provide access to the file when the user enters a passcode, and by Noah's own assertion, the corresponding structure is a **computer programmed** to provide such access.  Second, the portions of the specification upon which Noah relies for its asserted structure refer only to **issuing** passcodes to approved users and agents.  Noah Brief at 24 (quoting '435 Patent at 4:47-53).  They say nothing about **using those passcodes to provide access** to the recited file on the computer, as is indisputably required by this limitation.  Thus, even under Noah's view of the recited structure, this limitation is indefinite.

> ## 2. Intuit's proposed function for the "means for providing access" provides additional bases for indefiniteness of this limitation.

While Noah's proposed function for this limitation focuses solely on the requirement for "providing access" to a file on the financial accounting computer, Intuit contends that the rest of the language of the limitation establishes additional functional requirements.  In Intuit's view,

in addition to providing access to the file, the recited limitation must also allow a user to perform one or more of the activities recited in the claim: "entering, deleting, reviewing, adjusting, and processing said data inputs."  If this limitation did not require structure to allow a user to perform such functions, these functions would be indefinite.  *See, e.g.*, *Touchcom,* 427 F.Supp.2d 730, 736 (E.D. Tex. 2005).  Moreover, the function of the access means of claim 12 necessarily includes "entering," "deleting," "adjusting," and "processing" because those functions are also recited in dependent claims 48-51, which depend from claim 12.  For the access means of claims 48-51 to perform these functions, the access means of claim 12 must also include them.  *See CytoLogix Corp. v. Ventana Medical Systems*, 424 F.3d 1168, 1173 (Fed. Cir. 2005) (finding the district court erred in construing an independent claim in a manner that did not encompass the dependent claim).

A proper identification of corresponding structure therefore must include all the recited function in the claim element.  *Id.*  While Noah's proposed function copies the claim language, its identification of structure omits the recited functions "so that said first entity and/or said agent can perform one or more activities selected from the group consisting of entering, deleting, reviewing, adjusting and processing said data inputs."  Noah Brief at 24-25.  Features such as entering, deleting, and adjusting data inputs necessarily require more and/or different structure (i.e., algorithms) than the "computer . . . programmed to allow access" as proposed by Noah.  Thus, it appears that Noah's proposed construction improperly reads out those required functions.  *Touchcom, Inc. v. Dresser, Inc.*, 427 F.Supp.2d at 736.

The inclusion of such further requirements in the recited function for this limitation provides a further basis for finding the limitation indefinite.  Noah makes no attempt to identify any corresponding structure for performing these functions.  Accordingly, all asserted claims are

also indefinite for the absence of this necessary structure.

      **C.**      **"means for generating at least one accounting report from said data inputs" (claim 13)**

      Noah's proposed construction of the corresponding structure for the "means for generating" limitation makes no attempt whatsoever to identify any algorithm by which an "accounting report" is generated from "said data inputs."  Indeed, with the exception of the "financial accounting computer," which presumably has software loaded on it, Noah does not identify any computer software at all for this additional limitation.  Instead, the only additional structure identified for this limitation is computer hardware:  Noah asserts that the corresponding structure "includes the financial accounting computer, as defined above, **connected to a computer display or printer**."  Noah Brief at 26 (emphasis added).  Thus, even though the parties agree on the recited function, Noah's attempt to identify corresponding structure is plainly inadequate in light of Federal Circuit precedent.

      As explained above, where a means-plus-function limitation of a claimed invention is implemented by a computer, the corresponding structure **must** include the algorithm with which that computer is programmed to perform the recited function.  *Blackboard*, 574 F.3d at 1382-85; *NetMoneyIN*, 545 F.3d at 1367; *Finisar*, 523 F.3d at 1340-41; *Aristocrat*, 521 F.3d at 1333-38.  While the hardware Noah identifies – a computer display or printer – may perform the task of translating a generated accounting report into a physical form capable of being read by humans – pixels on a screen or ink on paper – the recited function requires more.  That function requires an "accounting report" to be generated "from said data inputs."  The '435 Patent contains no description of any algorithm for performing this software-implemented task.

      Noah cannot successfully supplement its insufficient reliance on display and printer hardware by its additional reference to "the financial accounting computer, as defined above."

Noah's proposed construction for the term "financial accounting computer" is merely "a computer that receives and processes electronically recorded financial transaction data from a financial transaction computer and provides useful accounting information to a user of the financial accounting computer."  Noah Brief at 13.  This proposed construction makes no mention of the function of "generating" any accounting reports.  Rather, it uses the even more generic phrase "provides useful information."  In no event does it satisfy the requirement for identifying any algorithm that either generates accounting reports or "provides useful information."

Noah's further attempts to revive this limitation also fail.  Noah admits that "[t]he prosecution history does not include any substantive discussion" concerning the limitation.  Noah Brief at 28.  Noah identifies a number of passages of the specification as describing the generating means.  Noah Brief at 26 (citing '435 Patent at FIG. 3, 6:42-7:17, 8:5-10).  However, although these sections describe selecting reports "from a large menu," printing, and sending reports to users of the system, no structure is disclosed for actually generating reports.  Noah emphasizes the ten report titles named in box 290 of FIG 3.  Noah Brief at 27 (citing '435 Patent at 7:15-17).  However, simply identifying the kinds of reports generated by the invention does not point out the algorithm for generating a report, as required by *Aristocrat* line of cases.  As no structure corresponding to the "generating means" function is disclosed, the limitation is indefinite.

### D.     "means for transferring funds from said first entity to said second entity" (claim 15)

Noah's attempt to identify corresponding structure for the "means for transferring funds" limitation of dependent claim 15 is materially identical to an attempt the Federal Circuit rejected earlier this year in the *Blackboard* case.  *See* 574 F.3d at 1382-85.  The parties agree that the recited function for this limitation is "transferring funds from the first entity to the second entity" and effectively agree that "transferring funds" means "debiting an account of one entity and crediting an account of the other entity" (or in Intuit's view, the equivalent, but more jury-friendly phrase "subtracting money from one account while adding a corresponding amount of money to another account").  Noah asserts that the corresponding structure is a "funds transfer facility such as that identified in Fig. 4" of the '435 Patent.

Although Figure 4 takes up a whole page of the '435 Patent, the portion on which Noah relies for this limitation is small.  Noah references only boxes 302 and 304 of Figure 4, connected to the rest of the system and each other by lines 301[8] and 303.



As Noah correctly states, the specification describes this portion of Figure 4 as follows:  "Line 301 leads to box 302, where account no. 1 (that of the merchant for example) is debited with the funds and then by line 303 to box 304 where account no. 2 (that of the entity being served) is credited."  Noah Brief at 32 (quoting '435 Patent at 7:30-34).  As shown above, the identified boxes state, in their entirety, "DEBIT ACCOUNT #1" (box 302) and "CREDIT ACCOUNT #2"

---

[8] Line 301 merely indicates that the user has elected to transfer funds from one account to another by answering "YES" to the question "INSTRUCTION TO TRANSFER FUNDS?" posed in box 300.  Thus, the actual function of "transferring funds" begins with box 302 and ends with box 304.

(box 304).   In other words, the portion of Figure 4 upon which Noah relies merely substitutes the parties' agreed definition of the function "transferring funds" for the functional term itself.  It does nothing to explain **how** the system performs the function of "transferring funds" or to identify the requisite algorithm for doing so.

In its attempt to fill this gap, Noah points to the "funds transfer facility" referenced in the specification.  In other words, Noah asserts that the structure for performing the function of "transferring funds" is a "funds transfer facility."  Noah Brief at 32.  While the specification of the '435 Patent does reference a "funds transfer facility," such a bare reference does nothing to save the validity of claim 15.

Indeed, the Federal Circuit rejected just such a circular attempt to identify corresponding structure in *Blackboard*.  *See* 574 F.3d at 1382-85.  In *Blackboard*, the recited function at issue was "means for assigning a level of access to and control of each data file based on a user in the system's predetermined role in the course."  *Id* at 1382.  The patentee Blackboard's asserted corresponding structure for the "means for assigning a level of access" was a server computer with an "access control manager."  *Id.*  However, as the Federal Circuit noted, the patent's "access control manager" was "simply an abstraction that describes the function of controlling access."  *Id.* at 1383.  In other words, "the access control manager, according to Blackboard, is any computer-related device or program that performs the function of access control."  *Id.*  That position amounted to impermissible "pure functional claiming," and the limitation in question was therefore invalid as indefinite.  *Id.* at 1383-85.

Noah has the same problem here.  As in *Blackboard*, the "funds transfer facility" is merely an abstraction – something the *Blackboard* court called a "black box that performs a recited function."  *Id.* at 1383.  There is no discussion in the '435 Patent of **how** the "funds

transfer facility" performs the function of transferring funds.  All we know is that it is supposed

to perform that function.  As in *Blackboard*, such "pure functional claiming" is insufficient to

save the relevant claim limitation from indefiniteness.

> ### E. **"means for electronically recording, collecting, processing, storing and transmitting said financial transactions" (claim 16)**

Noah's asserted structure for the "means for electronically recording…" limitation again

directly violates the same clear Federal Circuit precedent discussed above.  The parties agree that

the recited function is "electronically recording, collecting, processing, storing and transmitting

the financial transactions."   Noah's proposed structure is barely different – "**a computer**

**programmed to** record, collect, process, store and transmit the financial transactions."  Such an

attempt to claim nothing more than a computer programmed to perform the recited function is

tantamount to Aristocrat's impermissible attempt to point to a computer "with appropriate

programming" as its corresponding structure.  *Aristocrat*, 521 F.3d at 1334-38.  It is a transparent

attempt to conflate the recited function with the claimed "means" for performing that function –

an attempt that again results in indefiniteness.  *See id.*

## II. **INTUIT'S PROPOSED CONSTRUCTIONS SHOULD BE ADOPTED FOR THE DISPUTED TERMS AND LIMITATIONS**

> ### A. **"financial accounting system" (claims 12, 52, 53, 54, 55, 56)**

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| financial accounting system | A "financial accounting system" is an automated accounting system which brings together in an open connected network entities that are involved with financial transactions between a first entity or user, such as an individual or a business, and other entities.  It is an open system capable of | "a total accounting system in which users, such as businesses, individuals, merchants, financial institutions are connected into a network where financial transaction information is captured, analyzed, reviewed, adjusted and processed and then used to generate accounting statements," where |

| | collecting financial transaction data from multiple disparate sources, and in which diverse users are interconnected for automated accounting of financial transactions. | all the entities in the system "electronically record, collect, process, store and transmit all financial transactions by all the entities including the first entity, that enter into financial transactions with that particular entity." |
| --- | --- | --- |

1.　　**The term "financial accounting system," which appears only in the preambles of the asserted claims, should not serve as a limitation on the claims' scope.**

As an initial matter, Intuit contends that no construction of the phrase "financial accounting system" is necessary, since it appears only in the preambles to the asserted claims and does not serve as a limitation on the claims' scope.  Generally, the preamble does not limit the scope of a claim unless the claim drafter used the preamble in combination with the body of the claim to define the subject matter of the claimed invention.  In other words, the preamble is not limiting unless it is "necessary to give life, meaning and vitality" to the claim.  *Allen Engineering Corp. v. Bartell Industries, Inc.*, 299 F.3d 1336, 1346 ( Fed. Cir. 2002) (internal citations omitted).  This determination is made "on the facts of each case in view of the claimed invention as a whole."  *Id.*  Unless the preamble "states a necessary and defining aspect of the invention," it is not limiting.  *On Demand Machine Corp. v. Ingram Industries, Inc.*, 442 F.3d 1331, 1343 (Fed. Cir. 2006).  Where, the preamble "is simply an introduction to the general field of the claim" and a "convenient label for the invention as a whole" it is not limiting.  *Id*; *Storage Tech. Corp. v. Cisco Systems, Inc.*, 329 F.3d 823, 831 (Fed. Cir. 2003).

Such is the case here.  The phrase "financial accounting system" does not provide an antecedent basis or give meaning to a later limitation in any of the claims in which it appears.[9]

---

[9] In contrast to the phrase "first entity such as an individual or business," which provides the antecedent basis for the "first entity" in the phrase "financial transactions made between said first entity and a second entity." '435 Patent,

The balance of the claims "set[] out the complete invention" and should not be treated as limiting the scope of the claims in question. *See Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1310 (Fed. Cir. 2002); *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 809 (Fed. Cir. 2002) ("[A] preamble generally is not limiting when the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention.") (internal citations omitted).

The fact is evident when one performs the simple exercise of omitting the phrase from the preamble of, for example, claim 12 and replacing it with the term "system":

> 12. A [system] for a first entity such as an individual or a business, said system comprising:
> a financial accounting computer having at least one file;
> a financial transaction computer for receiving data inputs, said data inputs including electronically recorded financial transactions made between said first entity and a second entity;
> first communication means for transferring said data inputs from said financial transaction computer to said file of said financial accounting computer; and
> means for providing access to said file of said financial accounting computer for said first entity and/or agents of said first entity so that said first entity and/or said agent can perform one or more activities selected from the group consisting of entering, deleting, reviewing, adjusting and processing said data inputs.

'435 Patent at 12:26-42. The system recited in the modified version of claim 12 is complete even in the absence of the modifiers "financial" and "accounting" before the generic term "system." Therefore, the phrase "financial accounting system" does not "give life, meaning and vitality" to the claim and should not function as a limitation on claim scope.

2.    **Alternatively, Noah's attempt to limit the claimed "financial accounting system" to an "open" network should be rejected.**

An important difference between the parties' proposed constructions is Noah's attempt to insert the term "open" – which appears nowhere in the claims or specification of the '435 Patent – into the construction for the phrase "financial accounting system." Noah proposes a

---

claim 12 at 12:26-32.

construction that would limit the claimed invention to what it calls "open" networks, presumably in order to avoid prior art that Noah believes discloses only networks that are not "open."[10]   In fact, however, Noah's proposed construction is an improper attempt to import an extraneous limitation into the claims.  *See, e.g.*, *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) (reversing summary judgment based upon improper importation of limitation from specification); *Sofamor Danek Group, Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1220 (Fed. Cir. 1996) (improper to import limitations from prosecution history).  There is no support for importing the term "open" into the claims.

In contrast, Intuit's proposed construction, shown above, is taken directly from portions of the specification describing the claimed invention.  '435 Patent at 1:42-48; 4:13-17.   The applicant described the first portion, "a total accounting system . . ." as distinguishing his system from prior art systems.  He described the second portion – "electronically record, collect, process, store and transmit all financial transactions by all the entities" – as "[t]he key idea" of his invention.  Therefore, unlike Noah's construction, Intuit's proposed construction properly reflects the applicant's usage of the term "financial accounting system" in the patent specification and claims.

Noah's only support for its attempt to limit the claims to "open" networks or systems comes from an incorrect description of the prosecution history.   Noah suggests that during a May 5, 1998 Examiner Interview, the applicant and examiner agreed on changes to the claims to distinguish the invention as an "open system," resulting in the filing of the CIP application, including asserted claim 12, less than two weeks later, on May 18, 1998, and subsequent

---

[10] Noah makes a similar attempt – also unjustified – to import an "open" network requirement into the construction for the "first communication means" limitation.  That effort is addressed further below.

allowance based on those changes.  *See* Noah Brief at 7-10.  According to Noah, "[t]his [change] clarified that the system is an open and connected system rather than a closed or proprietary system such as the EDI system described by the Kniffen article previously applied against the original claims by the examiner."  Noah Brief at 9.   According to Noah's version of prosecution events, the claim amendments agreed upon during a May 1998 interview resulted in allowance of the patent over the Kniffen reference.

However, Noah's chronology is entirely wrong – leading to the erroneous conclusion that the amendment specifically distinguished the Kniffen reference by limiting the claim to an "open" network or system.  First, the Interview Summary Noah cites memorializes an interview that occurred before May 22, 1997, **an entire year before the CIP application containing claim 12 was filed**.  Exhibit G ('988 File History, May 22, 1997 Office Action Summary) (attaches cited interview summary).  Moreover, after that interview, the applicant filed a response, but did not include any changes to the claims at all.  *See Id.* at 3.  Thus, the filing of the amended claims a year later on May 18, 1998 almost certainly **had nothing to do with the Examiner's  Interview**.

Second, at the time of the interview summarized in the May 22, 1997 document, the Kniffen reference **had never been applied against the original claims**.  *See* Exhibit K ('988 File History, December 12, 1995 Non-Final Rejection), and June 26, 1996 Non-Final Rejection.  Kniffen was first cited by the examiner in a Final Office Action bearing the same date as the document summarizing the interview.  Thus, whatever changes the applicant discussed with the examiner before the May 22, 1997 Interview Summary, those changes were not made in response to the any rejection of the original claims based on the Kniffen reference, since that rejection **had not yet occurred**.  It is also obvious that the applicant failed to adequately

distinguish the claims from the Kniffen reference during the interview, since the examiner

promptly rejected the claims based on the reference that Noah now claims to have successfully

distinguished.

In fact, the applicant never distinguished his invention from Kniffen by arguing that the

invention is limited to an "open" system.  *See* Exhibit G at 3 ('988 File History, July 22, 1997

Amendment)  Rather, in response to the Final Office Action the applicant argued, "Kniffen fails,

however, to take the steps necessary to develop an accounting statements in a desired format."

On appeal, the applicant further argued,

> Kniffen likewise shows no concept of being integrated with any
> other system such as a credit card system.  While Kniffen refers to
> inter firm communications between General Motors and Budd,
> including transmission of invoices and electronic funds transfer,
> **there is no teaching that those steps are to be integrated with**
> **other steps in the accounting systems of General Motors or**
> **Budd**.  Instead, the inference is clear that there is no such
> integration.  Thus it becomes necessary for each of General Motors
> and Budd to separately enter the data transmitted electronically
> into their respective accounting systems.

Exhibit J at 8 ('988 File History, November 17, 1997 Appeal Brief) (emphasis added).  Thus, at

no time during the prosecution of the '435 Patent did the applicant distinguish his invention from

the prior art based on the now-alleged limitation to an "open" network or system.

Moreover, Noah ignores other distinguishing amendments to the claims that had nothing

to do with limiting the claims to an "open" network or system.  Noah insists that changing the

term "system for providing financial accounting reports and statements" in the original claim to

"financial accounting system" in the issued claims distinguished those claims from the prior art

because "financial accounting system" somehow is limited only to "open" networks and systems

– thus gaining allowance.  Noah Brief at 8-9.  This change, however, merely rearranged the

terms to simplify the preamble, retaining essentially the same meaning.

Conversely, other changes to the claims provided more significant bases for distinguishing the claimed invention from the General Motors/Budd system disclosed in Kniffen. At the same time the preamble was amended to read "financial accounting system," the applicant also changed the terms "first computer" and "second computer" to "financial ***accounting*** computer" and "financial ***transaction*** computer."  *Id.*  While General Motors and Budd each had computers that would read upon "first computer" and "second computer," those entities did not have systems with two separate computers performing different functions in the system – one an "accounting computer" and the other a "transaction computer."  *See* Exhibit G at 4 ('988 File History, May 22, 1997 Final Rejection) ("the first and second computers of the claim are interchangeable with the system of Budd or the system of GM.").  There is no evidence that the wordsmithing that changed "system for providing financial accounting reports and statements" to "financial accounting system" in the preamble was the reason for allowance of the claims, particularly in view of these other, more significant changes.

Nor does the reexamination file history for the '435 Patent provide any support for Noah's position.  To the contrary, the examiner during the reexamination never relied upon Noah's assertion that the claims were limited to "open" networks and systems.[11]  Instead, the examiner explicitly stated that claim 12, which now included the "financial accounting system" language, was **not** limited to "open" networks.  "[C]laim 12 simply does not require that the system is 'an open connected network' . . .  Such language is not found in the claim."  Exhibit R at 5 ('435 Reexamination File History, May 13, 2008 Office Action).

Not surprisingly, the Examiner's Statement of Reasons for Confirmation, upon which

---

[11] The Argument section of Noah's brief on this point concludes that "the recent comments in the Reexamination proceeding make clear that the term 'financial accounting system' means an automated accounting system which brings together in an ***open network*** entities that are involved with financial transactions . . . It is an ***open system*** . . . ."  (emphasis added).  Noah Brief at 10.

Noah also relies, never uses the term "open".  Exhibit F at 3-4.  Moreover, the examiner's statement distinguishing claim 12 over the prior art completely omits the "financial accounting system" term that Noah argues here limits the claim to "open" networks and systems:

> Claim 12 defines over Cushing et al. because the reference fails to teach a financial transaction computer . . . and first communication means.  Specifically, the network computer system described by Cushing et al. does not include a financial transaction computer receiving electronically recorded financial transactions that are transferred to a financial accounting computer, together with an equivalent under 35 U.S. C. 112, sixth paragraph, of the 'communication means' recited in claim 12.

Exhibit F at 4.  Rather, the distinguishing features were described as the financial transaction computer and the communication means, not the "financial accounting system" requiring an "open" network or system as Noah argues.  Thus, there is no support anywhere in the original or reexamination prosecution history for Noah's proposed construction.

As discussed above, Intuit's proposed construction is taken directly from the written description and properly captures what the inventor meant by "financial accounting system."  In contrast, Noah's proposed construction improperly requires that claim 12 is limited to "open" networks and systems, despite that term appearing nowhere in the '435 Patent.  Noah's construction is also unsupported by the prosecution history, especially when read with the correct chronology of events.  Thus, if the Court determines that Noah has overcome the presumption that preambles are not limiting, and the preamble of claim 12 is a limitation, it should adopt Intuit's proposed construction.

**B.      "first entity" (claims 12, 29, 30, 31, 32, 38, 42, 43, 47, 49, 50, 51, 52, 53, 56)**

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| first entity | A "first entity" is a user of the financial accounting system, such as an individual or a business. | "an individual or business" |

The term "first entity" is used in every asserted independent claim of the '435 Patent.

The following portions of claim 12 show exemplary uses of the term:

> 12.  A financial accounting system for a ***first entity such as an individual or a business***, said system comprising: . . .
> a financial transaction computer for receiving data inputs, said data inputs including electronically recorded ***financial transactions made between said first entity and a second entity***; . . .
> and means for providing access to said file of said financial accounting computer ***for said first entity and/or agents of said first entity*** so that said first entity and/or said agent can perform one or more activities . . . ."

Intuit's proposed construction comes directly from the specification's only disclosed examples of a "first entity."  "The first entity can be a business or individual." '435 Patent at 3:26.  Intuit's construction omits the unnecessary limitation implicit in Noah's proposed construction that the "first entity" be the user of the financial accounting system.  As the language of claim 12 above demonstrates, there are at least two possible users of the financial accounting system: (1) the individual or business or (2) the agent of that individual or business.  The specification of the patent frequently discusses use of the financial accounting system by agents of the first entity.  Unlike Noah's construction which limits the first entity to only "users", Intuit's construction includes both (1) individual/business and (2) agents.  *See, e.g.*, '435 Patent at FIG.1 and 4:47-61; 1:61-66; 2:34-37; 5:39-45.

Furthermore, the '435 Patent describes the use of the system by a plethora of other users, often identified as a "second entity," including merchants and financial institutions.  For example, the patent describes the automated exchange of data between a second entity using the financial transaction computer and the financial accounting computer operated by the first entity and/or its agents.  *See* '435 Patent at 3:65-4:35.  Indeed, dependent claims rely on the second entity to use the system to effect a transaction.  *See* claim 15 ("The system of claim 12 including means for transferring funds from said first entity to said second entity").  For this reason the

term "first entity" cannot encompass all "users" of the invention, but is properly limited to the disclosed "individual or business."

### C.   <u>__"financial accounting computer" (claims 12, 13, 14, 17, 31, 33, 34, 52, 53, 54, 55, 56)__</u>

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| financial accounting computer | "a programmable electronic machine that receives and processes electronically recorded financial transaction data from a financial transaction computer and provides useful accounting information to a user of the financial accounting computer." | "a central or host computer with a master ledger used to receive data inputs in the form of electronically recorded financial transactions" |

Intuit's proposed construction of "financial accounting computer" is taken directly from the written description of the '435 Patent.  The patent describes two sets of entities, the so-called first entities "being served" by the automated accounting system, and those "entities with which the first entity will enter into financial transactions" such as "financial institutions, merchants . . . automated teller machines, banks (for checking and savings accounts, for example), investment/brokerage firms, merchants and other automated systems/record keeping devices." '435 Patent at 3:26-40, 3:65-4:10.  The patent distinguishes these two groups of entities.  The second or latter group, with which the first entity will enter into financial transactions, have transaction computers containing "subsidiary ledgers."  *Id.* at 3:66-4:3. The first entities, therefore, have "a central or host computer [with] a master ledger that is used to received data inputs in the form of electronically recorded financial transactions." *Id.* at 3:26-29.   Intuit's construction is taken directly from this language.

Noah's construction, on the other hand, appears to be derived from sources outside the patent.  Despite Noah's bolding of several quotations from the '435 Patent specification,

including "the central or host computer" "which can receive data inputs" "includ[ing]
electronically recorded transactions made between the entity and other entities," little of the
bolded language appears in Noah's proposed construction.  Noah Brief at 11.  In fact, the
sections Noah argues "describe a financial accounting computer" includes "a central or host
computer [with] a master ledger that is used to receive data inputs in the form of electronically
recorded financial transactions" – precisely the construction proposed by Intuit.

In contrast, Noah's construction adds the language, "and provides useful accounting
information to a user of the financial accounting computer," which is found nowhere in the cited
specification or prosecution history.  Moreover, the term "useful accounting information" is
inherently ambiguous due to differing opinions regarding what information is useful, and thus is
unhelpful to the jury or the Court.  Thus, the language "providing useful accounting information
. . ." is unnecessary, unsupported and confusing and should be rejected.

Furthermore, Noah's construction appears to substitute an "agreed" definition for the
term "computer."  However, the definition Noah uses does not accurately reflect the parties'
agreement.  During the meet-and-confer process, Intuit told Noah that it does not believe the
term "computer" requires construction:  The term is well-known, and providing a construction
would only complicate otherwise uncomplicated constructions.  However, Noah insisted that the
term "computer" has no ordinary meaning and thus proposed the following definition:  "a
programmable electronic device that can store, retrieve, and process data."  To streamline the
claim construction process, Intuit did not object to the proposed definition of "computer" but told
Noah that it did not think the definition needs to be repeated into every claim term using the
word "computer."  Despite Intuit's concern, Noah has replaced all the instances of "computer" in
the disputed terms with one form or another of its definition for computer.   However, the

definition Noah uses is not the agreed definition.  Instead, Noah has dropped "stores" from the

agreed definition and changed "retrieves" to "receives" for no apparent reason.  Intuit therefore

reiterates its position that construing the widely understood term "computer" will only cause

unnecessary confusion and asserts that the term should be given its ordinary meaning.

Alternatively, Intuit requests at least that the agreed definition for the term be the construction

upon which the parties actually agreed.

### D.   **"financial transaction computer" (claims 12, 40, 41, 52, 53, 56)**

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| financial transaction computer | A "financial transaction computer" is a programmable electronic machine that receives and processes data inputs including electronically recorded financial transactions made between the first entity or user and another entity. | A computer with a subsidiary ledger operated by or on behalf of an entity that participates in financial transactions with the first entity. |

Intuit proposes that the term "financial transaction computer" means "a computer with a

subsidiary ledger operated by or on behalf of an entity that participates in financial transactions

with the first entity."  That construction follows from the plain meaning of the term as used in

the specification and the claims, as well as the inventor's own characterization of the terms

during reexamination.

As Noah points out in its brief, the specification of the '435 Patent describes the financial

transaction computer as a computer operated by third parties (or "second entities") from which

the first entity's financial accounting computer will receive data inputs describing financial

transactions between the two entities.[12]  Noah Brief at 14-16; '435 Patent at 3:66-4:34.

---

[12] See II(E), *infra* for the claim construction arguments for "data inputs" (an agreed-upon term) and "financial transactions" (plain meaning).

Furthermore, during the reexamination proceedings, Noah described the financial transaction computer as a secondary computer that participates in financial **transactions**, as opposed to performing financial **accounting** functions:

> During prosecution of the 08/313,988 parent application, in response to a rejection over the EDI system described by Kniffen, it was agreed to clarify Claim 12 to make clear what was inherently recited in the original claim, namely, that the originally recited "first computer" is used to perform financial accounting functions, and that the originally claimed "second computer" is a different computer that participates in financial transactions."

Exhibit S at  13 (Appeal Brief).

The specification lists as examples "financial institutions, merchants, and other entities with which the entity being served will have financial transactions, including but not limited to automated teller machines, telephonic computers, banks (for checking and savings accounts, for example), investment/brokerage firms, merchants and other automated systems/record keeping devices." '435 Patent at 4:3-8.  The specification describes the use of a "subsidiary ledger" on the financial transaction computer to facilitate its function – to record data regarding the financial transactions and transmit it to the financial accounting computer of the first entity so as to enable accurate accounting.  '435 Patent at 4:13-20 ("The key idea is for all of these entities to electronically record, collect, process, store and transmit all financial transactions by all of the entities, including the first entity, that enter into financial transactions with that particular entity. In this way, all of the entities can be connected in a network fashion so that accounting information can be fully and accurately developed among all of the entities.").  Therefore, a financial transaction computer is operated by or on behalf of an entity that enters into financial transactions with the first entity and has a subsidiary ledger used to record the transactions.

E.   **"data inputs" (claims 12, 42, 48, 49, 50, 51, 52, 53, 56)**

The parties agree that "data inputs" means electronically recorded information relating to

the financial transactions.  "Data inputs" are clearly defined as such in the specification of the

'435 Patent.  *See* '435 Patent at 3:20-22 ("The financial transactions are recorded as data inputs

in a file established for the first entity."); *id.* at 3:26-29 ("The entity being served will have

established at a central or host computer a master ledger that is used to receive data inputs in the

form of electronically recorded financial transactions.").

F.   **"electronically recorded financial transactions made between a said first entity and a second entity" (claims 12, 52, 53, 56)/"financial transactions" (claims 12, 33, 34, 38, 42, 53, 54, 55)**

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| electronically recorded financial transactions made between a said first entity and a second entity/financial transactions | "Financial transactions" means an exchange or transfer of an asset for value or payment.<br><br>"Electronically recorded financial transactions made between said first entity and a second entity" are financial transactions between the user and another entity that have been electronically recorded. | Financial transactions: plain meaning.<br>Electronically recorded financial transactions made between a said first entity and a second entity: plain meaning in light of other constructions. |

The Federal Circuit has observed that questions over what meets the scope of the claims

are appropriately left to the jury in some contexts.  *See Acumed LLC v. Stryker Corp.*, 483 F.3d

800, 806 (Fed. Cir. 2007) ("[A] sound claim construction need not always purge every shred of

ambiguity. The resolution of some line-drawing problems—especially easy ones like this one—

is properly left to the trier of fact.").   The term "financial transactions" has an ordinary and

customary meaning that will be understood by a jury without need to reference a particular

definition.  The examples of financial transactions listed in the specification are common events

familiar to any potential juror.  *See* '435 Patent at 1:52-53; ("a customer purchases a building

product, such as a window, from a building products dealer"); 2:44-45 ("transfer of funds and

instruction for transfer of funds"); 4:5-10 (use of automated teller machines,

investment/brokerage firms); 5:55-56 (credit card transactions).  There is no reason to complicate

the issues or introduce potential ambiguities when the fact finder already knows the proper

definition for the term.

Similarly, the entire phrase "electronically recorded financial transactions made between

a said first entity and a second entity" needs no further construction, given that "financial

transactions," "first entity," and "second entity" have all been discussed in this brief.  Like

"computer" and "financial transactions," the specification of the '435 Patent does not prescribe a

particular definition for either the entire phrase or the term "electronically recorded."  Common

experiences with electronically recorded financial transactions range from the use of automated

teller machines to credit card terminals in store and online banking.  There is no need for any

further construction of the phrase "electronically recorded financial transactions made between

said first entity and a second entity."

   G.   **"first communication means for transferring said data inputs from said financial transaction computer to said file of said financial accounting computer"  (claims 12, 47, 52, 53, 56)**

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| first communication means for transferring said data inputs from said financial transaction computer to said file of said financial accounting computer | The function is transferring the data inputs from the financial transaction computer to the file of the financial accounting computer.<br><br>The structure is an open connected network accessible by the first entity and other entities such as merchants and financial institutions that are involved with financial transactions with the first entity.  <u>The network</u> | <u>Function:</u>  transferring said data inputs from said financial transaction computer to said file of said financial accounting computer<br><br><u>Structure:</u>  Indefinite<br><br>Alternatively, if any corresponding structure is found, it  must include at least: "(1) <u>a network connecting the financial accounting computer and the financial transaction</u> |

| | | |
|---|---|---|
| | connecting the financial accounting computer and the financial transaction computer produces a total accounting system in which diverse users including the first entity and other entities are interconnected for automated accounting of financial transactions, thereby making it possible for the accounting system to generate accounting records useful to the diverse users of the network.  The structure includes communication links between the financial accounting computer and external sources such as the financial transaction computer that allow the transfer of the data inputs.  The structure includes a modem or other data transfer equipment for communicating over the network and a common language to enable the computers to communicate processing instructions and utilize standardized transaction codes. | computer to produce a total accounting system in which diverse users are interconnected for automated accounting of all financial transactions; (2) a modem or other data transfer equipment for communicating over the network; and (3) a common language used by both the financial accounting computer and the financial transaction computer to enable the computers to communicate processing instructions and utilize standardized transaction codes." |

Intuit contends that this limitation is indefinite for the reasons discussed above in Part I of the Argument.  However, if this limitation is not found to be indefinite, its construction must include certain elements, as discussed below.

   1.  **If the "first communication means" limitation is not found to be indefinite, its corresponding structure must include the elements identified in the reexamination's Statement of Reasons for Confirmation.**

The parties agree that the term "first communication means" should be construed pursuant to 35 U.S.C. § 112 ¶ 6.  *See* Noah Brief at 17.  The parties also agree that the recited

function of this term is "transferring said data inputs from said financial transaction computer to said file of said financial accounting computer."  *See* Noah Brief at 23.  The parties disagree about whether the specification contains sufficient structure corresponding to that function.  As discussed above, Intuit contends that the specification lacks sufficient corresponding structure and that this limitation is therefore indefinite.  However, if a corresponding structure is found, it must at least include at least the following elements:  (1) a network connecting the financial accounting computer and the financial transaction computer to produce a total accounting system in which diverse users are interconnected for automated accounting of all financial transactions; (2) a modem or other data transfer equipment for communicating over the network; and (3) a common language used by both the financial accounting computer and the financial transaction computer to enable the computers to communicate processing instructions and utilize standardized transaction codes.  As the underlining in the above chart reflects, Noah agrees with Intuit that the corresponding structure must include all three elements.

Intuit's identification of structure for the "first communication means" tracks exactly the structure provided by the examiner during the reexamination of the '435 Patent.  Noah's construction contains Intuit's construction in its entirety, yet adds other, unnecessary and unsupported limitations, such as requiring an "open" network and "generating reports useful to the diverse users of the network."

During the reexamination, the applicant based its entire argument for patentability of claim 12 on the "first communication means" element.  *See* Exhibit L at 16-20 ('435 Reexamination File History, March 10, 2008 Amendment).  The examiner identified the corresponding structure as follows:

> Therefore, the "first communication means for transferring . . ."
> recited in claim 12, when interpreted under 35 USC 112, sixth

> paragraph, includes the following key features: (1) a network connecting the financial accounting computer and the financial transaction computer to produce a total accounting system in which diverse users are interconnected for automated accounting of all financial transactions; (2) a modem or other data transfer equipment for communicating over the network; and (3) a common language used by both the financial accounting computer and the financial transaction computer to enable the computers to communicate processing instructions and utilize standardized transaction codes.

Exhibit F at 3-4 ('435 Reexamination File History, Statement of Reasons for Confirmation).

Moreover, the examiner made clear that these features were required to overcome the prior art:

"Specifically, the network computer system described by Cushing et al. does not include . . . an

equivalent under 35 U.S.C. 112, sixth paragraph, of the 'communication means' recited in

claim 12." *Id.* at 4. Thus, to the extent that this limitation has a corresponding structure, the

construction should track the examiner's language.

> 2.      **Noah's attempt to limit the corresponding structure for the "first communication means" to an "open" network should be rejected.**

By contrast, Noah's proposed construction attempts to import an additional requirement

based neither on the examiner's statement nor on any other creditable portion of the intrinsic

record. As with its proposed construction of "financial accounting system," discussed above,

Noah again attempts to import into its construction for the "first communication means" the

requirement for an "open" network, although that term is found nowhere in the written

description or claims.

Nor does such a requirement appear in the examiner's statement discussed in the previous

section. Indeed, the examiner in the reexamination directly rejected Noah's position.

> Specifically, patent owner asserts that Cushing et al. is directed to a closed, proprietary system which does not permit transmission of data to entities outside the system, where as "communication means" recited in claim 12 refers to an open connected network accessible by all entities involved in any given financial

> transaction.  This argument is not persuasive for the following reasons.  First, ***claim 12 simply does not require that the system is "an open connected network*** accessible by all entities involved in any given financial transaction."  Such language is not found in the claim.  Further, the broad recitation of ***a "communication means" does not necessarily require an open connected network*** accessible to all.  In attempting to give a narrow interpretation to a broad limitation, the patent owner is improperly reading limitations into the claim.

Exhibit R at 5-6 ('435 Reexamination History, May 13, 2008 Office Action).  Thus, as described above in connection with "financial accounting system," there is no support in the '435 Patent specification, claims or prosecution history for limiting the claims to only "open" networks.

Therefore, the Court should reject Noah's proposed construction importing the "open" limitation.

**H.**   **"means for providing access to said file of said financial accounting computer for said first entity and/or agents of said first entity so that said first entity and/or said agent can perform one of more activities selected from the group consisting of entering, deleting, reviewing, adjusting, and processing said data inputs" (claims 12, 48, 49, 50, 51, 52, 53, 56)**

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| means for providing access to said file of said financial accounting computer for said first entity and/or agents of said first entity so that said first entity and/or said agent can perform one or more activities selected from the group consisting of entering, deleting, reviewing, adjusting and processing said data inputs | The function is providing access to the file of the financial accounting computer for the first entity and/or agents of the first entity so that the first entity and/or the agent can perform one or more activities selected from the group consisting of entering, deleting, reviewing, adjusting and processing the data inputs.

The structure includes the financial accounting computer, as defined above, which is programmed to allow access to files on the computer upon entry of a passcode. | Function:  authorizing one or more users to obtain access to said file and allowing such authorized users to perform one or more activities from the group consisting of  entering, deleting, reviewing, adjusting, and processing said data inputs

Structure:  Indefinite.

Alternatively, if any corresponding structure is found, it must include at least the financial accounting computer programmed to perform an algorithm specifically recited in the specification for performing the recited function and |

| | | clearly linked to performing that function. |
|---|---|---|

Intuit contends that this limitation is indefinite, and that the recited function advanced by

Noah is too narrow.  This limitation is discussed above in Part I of the Argument.

### I.        "means for generating at least one accounting report from said data inputs" (claim 13)

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| "means for generating at least on accounting report from said data inputs" | This term should be governed by 35 U.S.C. § 112(6). The function is generating at least one accounting report from the data inputs. An "accounting report" is a report generated from the financial transaction data in accordance with generally accepted accounting principles.<br><br>The structure includes the financial accounting computer, as defined above, connected to a computer display or printer. | Function: generating at least one accounting report from said data inputs Structure: Indefinite |

Intuit contends that this limitation is indefinite for the reasons discussed above in Part I of

the Argument.

### J.        "accrual accounting data inputs/accrual accounting" (claim 14)

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| a first said file in said financial accounting computer for receiving **accrual accounting data inputs** | "Accrual accounting" is an accounting method in which income is recorded when it is earned and expenses are recorded when they are incurred.<br><br>"Accrual accounting data | Data inputs to be recorded at the time a product is shipped, a service is rendered, or a purchase is received as opposed to the time at which payment is received or made. |

| | inputs" are data inputs that are used for accrual accounting purposes. | |
|---|---|---|

Intuit's proposed construction of "accrual accounting data inputs" accurately reflects the term "accrual accounting" as used in the industry, but does so in layman's terms.  Noah's construction is needlessly confusing and ambiguous.  For example, a jury is more likely to understand Intuit's construction referring to products shipped and services rendered rather than Noah's accounting-laden "income is recorded when it is earned . . . ." language.  Moreover, the difference between accrual basis accounting and cash basis accounting relates to when transactions are recorded.  *See*, *e.g.*, Exhibit O at ¶¶ 44-48 (FASB Statement of Financial Accounting Concepts) (FASB 1978).  However, defining that time as when income is "earned" and expenses are "incurred" provides insufficient clarity, because opinions differ as to when such events occur.  Noah's construction is further imprecise because in exchange for a product or service, individuals or entities record revenue, not income (which is the result of receiving revenue, minus all expenses).

According to the Financial Accounting Standard Board, the entity responsible for developing and maintaining the Generally Accepted Accounting Standards in the United States, "Accrual accounting attempts to record the financial effects of transactions, events, and circumstances that have cash consequences for an organization in the periods in which those transactions, events and circumstances occur rather than in only the periods in which cash is received or paid."  *Id.* at ¶ 44.  Cash basis accounting, on the other hand, simply records a transaction when cash is received or paid.  Using accrual basis accounting, proceeds from a sale of goods may be recorded when the product is shipped, even though no money has changed hands yet.  In contrast, using cash basis accounting, the proceeds from the same sale of goods

cannot be recorded until the money is actually received, which may only occur after the purchaser receives and pays an invoice.

Intuit's proposed construction accurately reflects accrual-basis accounting as defined under the General Accepted Accounting Practices, yet does so in language familiar to a jury. In contrast, Noah's proposed construction is inaccurate, confusing and ambiguous. Therefore, the Court should adopt Intuit's proposed construction.

### K. "cash accounting data inputs/cash accounting" (claim 14)

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| a second said file in said financial accounting computer for receiving *cash accounting data inputs*. | "Cashing accounting" is an accounting method in which income and expenses are recorded when they are paid.<br><br>"Cash accounting data inputs" are data inputs that are used for cash accounting purposes. | Data inputs to be recorded at the time at which payment is received or made, as opposed to the time a product is shipped, a service is rendered or a purchase is received. |

As discussed above in connection with the term "accrual accounting data inputs," Intuit's proposed construction accurately reflects the concept of cash-basis accounting as used in the industry. The parties' proposed constructions of "cash accounting data inputs" differs only with regard to the description of when various events are recorded. For the same reasons articulated above, Noah's proposed construction is inaccurate, confusing and ambiguous. Therefore, the Court should adopt Intuit's construction.

### L. "means for transferring funds from said first entity to said second entity" (claim 15)

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| means for transferring funds from said first entity to said second entity | The function is transferring funds from the first entity to the second entity.<br><br>The structure is a funds | Function: transferring funds from said first entity to said second entity<br><br>Structure: Indefinite |

| | transfer facility in which the first and second entities have established accounts and funds/payments are electronically transferred between the accounts. | Alternatively, if any corresponding structure is found it must include at least a "funds transfer facility" and "clearing house" including one or more computers programmed to perform an algorithm specifically recited in the specification for performing the recited function and clearly linked to performing that function. |
|---|---|---|

Intuit contends that this limitation is indefinite for the reasons discussed above in Part I of the Argument. However, if this limitation is not found to be indefinite, its construction must include certain elements, as discussed below.

The parties agree that "means for transferring funds" should be construed pursuant to 35 U.S.C. § 112 ¶ 6. The parties also agree that the recited function is "transferring funds from the first entity to the second entity." However, the parties disagree as to the proper identification of corresponding structure. If any construction of this means-plus-function claim element is to be made, the structure must include at least a "funds transfer facility" and "clearing house," including one or more computers programmed to perform an algorithm specifically recited in the specification for performing the recited function and clearly linked to performing that function. Noah's proposed structure, on the other hand, only includes a "funds transfer facility," a term with no common meaning. Because Noah omits the clearing house described in the specification, Noah's construction is wrong and should be rejected.

The specification describes "transferring funds" as requiring **both** a "funds transfer facility" and a "clearing house": "The funds transfer facility allows automatic (electronic) transfer of funds/payments by and between the entity's accounts (banks for example) as instructed. Access to any and all payment clearinghouses is anticipated along with the funds

transfer facility." 7:25-30.   Additionally, the specification describes a clearinghouse as a mandatory part of the invention:  "an effective system ***must*** have a funds transfer clearinghouse such as that disclosed in U.S. Patent Nos. 5,220,501 and 5, 202, 826." '435 Patent at 2:9-12.

Notably, during the original prosecution of the 1994 parent application, the applicant distinguished his invention over prior art because it was "capable of electronically making funds transfers in connection with credit card accounts, checks, debit cards, investment accounts, and ATMs, etc."  Exhibit J ('988 File History, November 17, 1997 Appeal Brief).  In the United States, nearly all of these types of transactions occur via the Automated Clearing House Network,[13] operated by the Federal Reserve for clearing transactions occurring between different financial institutions.  *See* http://www.nacha.org/About/what_is_ach_.htm.  Therefore, in order to transfer funds between a first entity and a second entity, the structure must also include a clearing house as described in the '435 Patent and known in the art.  Because Noah's construction ignores this required structure for transferring funds, the Court should adopt Intuit's proposed construction.

### M.   "transferring funds" (claim 15)

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| transferring funds | "Transferring funds" means debiting an account of one of the entities and crediting an account of the other entity. | Subtracting money from one account while adding a corresponding amount of money to another account. |

Intuit's proposed construction of "transferring funds" –  "subtracting money from one account while adding a corresponding amount to another account" – accurately reflects the usage of the term in the '435 Patent and in the art without resorting to accounting language likely to be unfamiliar to many jurors.  In contrast, while semantically identical to Intuit's proposed

---

[13] By 1988, the number of transactions conducted via ACH exceeded 1 billion, annually. Exhibit Q (http://www.nacha.org/news/NACHA%20History.pdf).

construction, Noah's proposed construction requires jurors to parse what may be unfamiliar

language.  Moreover, Noah's proposed construction unnecessarily limits "transferring funds" to

a transaction between two separate entities, thus eliminating the possibility that a single

individual or entity could transfer funds between its own multiple bank and credit card accounts.

Nothing in the '435 Patent or prosecution history requires such a limitation.  *See*, '435 Patent at

7:25-30 ("The funds transfer facility allows automatic (electronic) transfer of funds/payments ***by***

***and between the entity's accounts*** (banks for example) as instructed.").  Because Intuit's

proposed construction is simpler, less confusing, and more accurate than Noah's, the Court

should adopt it.

**N.**     **"means for electronically recording, collecting, processing, storing and transmitting said financial transactions" (claim 16)**

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| "means for electronically recording, collecting, processing, storing and transmitting said financial transactions"<br><br>This term should be governed by 35 U.S.C. § 112(6). | The function is electronically recording, collecting, processing, storing and transmitting said financial transactions.<br><br>The structure is a computer programmed to record, collect, process, store, and transmit the financial transactions. | Function: electronically recording, collecting, processing, storing and transmitting said financial transactions.<br><br>Structure: Indefinite |

Intuit contends that this limitation is indefinite for the reasons discussed above in Part I of

the Argument.

**O.**     **"processing . . . said financial transactions" (claim 16)**

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| "processing . . . said financial transactions" | "Processing, … said financial transactions" means performing operations on financial transaction data in the financial transaction | Indefinite |

| | computer. | |
|---|---|---|

Intuit contends that this limitation is indefinite.  Examination of the intrinsic evidence yields no definition of this term understandable by one of skill in the art.  *See William P. Young v. Lumenis, Inc.*, 492 F.3d at 1346.  As Noah points out, "[t]he prosecution history does not include any substantive discussion" concerning the limitation.  Noah Brief at 37.  Noah identifies a long passage of the specification as describing the "processing . . ." limitation.  Noah Brief at 34; '435 Patent at 4:65-6:14.  This section of the specification, however, describes the entire means-plus-function limitation[14] of which this limitation is a part.  *See* '435 Patent at 4:65-5:6 ("Referring now to FIG. 2, the establishment of, operation of and transfer of data from the subsidiary ledgers will be discussed. It will be appreciated that each of the other entities in the network will have means . . . **which will be used to electronically record, collect, process, store and transmit** all financial transactions between the first entity (and other entities) with that particular entity.") (emphasis added).  Boxes 100 through 110 and the accompanying text in column 5 describe configuration functions that occur before any financial transactions are recorded, such as account setup, configuration of the communications means, starting balances for the subsidiary ledger, and the creation of user login accounts.  *See* '435 Patent at 5:7-44, FIG. 2.  Box 112 describes the "recording" function, not the "processing" function at issue here.  *Id.* at 5:45-56.  Boxes 160 and 170 describe the "collection" and "transmitting" functions of the financial transaction computer.  *Id.* at 6:6-13.  The remaining portions of the identified passage in the specification, namely those sections describing boxes 130, 132, 140, 152, deal with validation of entries in the subsidiary ledger.  No part of the specification identifies what, if anything "processing" means as applied to the financial transactions.  The patent fails to put the

---

[14] The entire means-plus-function limitation is invalid for indefiniteness as described in section I(B), *supra*.

public on notice as to what "processing" does and does not entail in the context of the claims, and the limitation is therefore indefinite. *PSC Computer Prods., Inc. v. Foxconn Int'l*, 355 F.3d 1353, 1361 (Fed. Cir. 2004).

**P.    "personal computer" (claim 17)**

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| "personal computer" | The term "personal computer" means a computer built around a microprocessor for use by a business or individual. | Plain meaning. |

Like several other terms for which Noah has proffered an unnecessary construction, "personal computer" is a common term that any juror will recognize and need not be further construed.  *See Acumed*, 483 F.3d at 806.  The only evidence that Noah points to in support of its construction is a dictionary definition and an excerpt from the specification that does not even define the term: "It will be appreciated, however, that the central or host computer can be the individual entity's personal automatic computing device (such as a personal computer or a telephone computing device) which can receive the data inputs and, in the case of a personal computer, for example, process the data inputs by using off-the-shelf accounting software." Noah Brief at 37-38 (quoting '435 Patent at 3:30-36).  This phrase does not define the term, but merely describes an ordinary use of a personal computer commonly understood by even non-technical persons – to operate "off-the-shelf [] software."  The jury will not be aided in its resolution of this case by further complicating a term that is widely known and understood. "Personal computer" has a plain meaning and that meaning should be adopted in this case.

**Q.    "telephone computer" (claim 17)**

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| "telephone computer" | The term "telephone | Indefinite |

|  | computer" means "the user's personal automatic computing device with a telephone connection." / "a computer with a telephone connection."[15] |  |

Unlike "personal computer," "telephone computer" was *not* a commonly-understood term at the time the parent application for the '435 Patent was filed. *See e.g. Schering Corp. v. Amgen Inc.*, 222 F.3d 1347, 1353 (Fed. Cir. 2000) (claim terms are interpreted as one of skill in the art would have understood them at the time the invention was made)..  It has neither a commonly-understood definition nor is it defined in the intrinsic evidence.   Noah admits that "[t]he prosecution history does not include any substantive discussion" concerning this limitation, but points again to the same text that mentions "personal computer": "It will be appreciated, however, that the central or host computer can be the individual entity's personal automatic computing device (such as a personal computer or a telephone computing device) which can receive the data inputs . . . ."  Noah Brief at 38 (quoting '435 Patent at 3:30-34).  This passage does not explain what a "telephone computer" **is**, nor does it support Noah's proposed construction of "a computer with a telephone connection."  Noah's alternate construction, "the user's personal automatic computing device with a telephone connection," while clearly drawn from the language in the specification, is as ambiguous as the phrase it purports to explain.  Noah points to nothing in the specification that gives any meaning or scope to this limitation, and the limitation is therefore indefinite.  *See Young*, 492 F.3d at 1346.

---

[15] Noah has proposed three different constructions for this term, one in the Amended Joint Disputed Claim Terms Chart (Dkt. 71), a slightly different construction in the "Proposed Construction" section of Noah's Brief (at 37), and a third construction in the "Argument" section of Noah's Brief (at 38).  The latter two constructions are listed here.

**R.**     <u>"financial transaction codes" (claims 33, 54)</u>

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| said financial accounting computer provides a menu of *financial transaction codes* for association with said financial transactions. | "Financial transaction codes" are codes associated with the treatment of financial transaction data. | Standardized codes instructing all computers in the network what operations to automatically perform on a particular transaction. |

Intuit's construction of "financial transaction codes" accurately reflects the usage of the term in the '435 Patent and prosecution history. During reexamination, the applicant described the importance of the standardized transaction codes to his invention: "The invention includes the establishment of a standardized code system in which users select and apply the codes as they conduct financial transactions with other entities, and the applied codes are transmitted to a separate financial accounting system . . . to automatically generate accounting statements without the necessity of reentering data." Exhibit S at 2 ('435 Reexamination File History, Appeal Brief). The specification describes financial transaction codes as providing instructions to other computer regarding what operations to perform:

> [S]tandardized transaction codes includ[e] one or more of the following: transaction process instructions, charts of accounts, user selection menus, accounting rules and standard calculations, funds transfer instructions and codes, individual system network instruction codes, and layers or tiers of instructions and financial accounting codes for individual system or connected systems operations.

'435 Patent at 4:20-35. *See also* '435 Patent at 9:3-58 (describing the use of standardized transaction codes to instruct a contractor's computer to adjust various accounts, such as depreciation, asset, and credit card accounts, among other accounts based on the transaction codes.); 10:14-29.

Noah's construction, however, merely defines the transaction codes as "associated with

the treatment of financial data." The nature of the "association" and "treatment" are unclear, and the construction does nothing to inform the jury's understanding of what the transactions codes are or what purpose they serve. Indeed, Noah's construction leaves open the possibility that the transaction codes are not even used by the computers in the financial accounting system, when the invention clearly requires such use. Thus, the Court should adopt Intuit's proposed construction, as it is the only construction that is true to the claims and the specification.

### S.   "for association with said financial transactions" (claims 33, 34, 54, 55)

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| said financial accounting computer provides a menu of financial transaction codes *for association with said financial transactions.* | "For association with said financial transactions" means the financial transaction codes are associated with the financial transactions. | To be assigned to particular individual financial transactions. |

Noah's construction does nothing more than parrot the claim language and provides no guidance as to what it means to "associate" a code with a transaction. *Compare* Exhibit E at 2:1-3 ('435 Reexamination Certification) ("financial transaction codes *for association with said* financial transactions") *with* Noah Brief at 39 ("financial transaction codes *are associated with the* financial transactions.") Noah's proposed construction merely changes the phrase, "for association with" to the slightly more active phrase, "are associated with." However, Noah's construction does nothing to clarify what is required to practice this claim limitation.

Intuit's proposed construction, "to be assigned to particular individual financial transactions," provides significantly more guidance as to the meaning of "for association with said financial transactions" and is fully supported by the specification. The specification discusses assigning code numbers to transactions with reference to item 102 of Fig. 2: "Next, line 101 leads to box 102 where the personal/business code numbers for transaction recording **are assigned** similar to box 22 in Fig. 1." '435 Patent at 5:8-11. Thus, associating the

transaction codes means **assigning the codes** to financial transactions.

The sections of the specification Noah cites in support of its construction do not discuss associating codes to financial transactions at all.  Noah Brief at 39.  Rather, those sections discuss assigning codes to **accounts:**  "The system then proceeds by line 21 to box 22 where the **accounts** established above are assigned code numbers."  *Id.*; '435 Patent at 3:54-55.  In contrast, the claim term requires association "**with said financial transactions**", not accounts.  As a result, the sections cited by Noah provide no support for construction of this claim term.  Therefore, the Court should adopt Intuit's proposed construction.

T.    **"standardized itemization code" (claims 34, 55)**

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| said financial accounting computer provides a menu of *standardized itemization codes* for association with said financial transactions. | "Standardized itemization codes" are established codes that represent products and services. | An identifier for a product or service agreed upon by the parties to the transaction and identifying a preferred accounting treatment for the transaction. |

Intuit's proposed construction differs from Noah's in several respects.  First, Intuit's construction captures the notion from the specification and prosecution history that the parties to a transaction have agreed upon the codes prior to use, whether through a standardization process or by private agreement.  Noah's construction, however, only requires use of "established codes," and fails to capture the idea that all users in the system must use **the same codes**.  For example, under Noah's proposed construction, one party may use one set of established codes, while another party may use a completely different set of established codes, frustrating the entire purpose of the claimed invention.  In contrast, the specification describes the use of "standardized item numbers agreed upon by the parties."  '435 Patent at 8:50-55.  Moreover, during prosecution, the applicant further explained the meaning of "standardized codes":

> The term 'standardized codes' means that the Code is a standard
> one.  The standard might be a government standard, or it might be
> an industry standard, or it might be a standard agreed upon solely
> between the parties to the transaction.  The point of the claim is
> that the coding is standardized by someone and that it is used by
> the parties to the transaction with that understanding.

Exhibit G at 2 ('988 File History, May 22, 1997 Amendment).  In short, both the prosecution

history and the specification indicate that the parties to the transaction must all be using **the**

**same** standard itemization codes.  Intuit's construction, "an identifier for a product or service

agreed upon by the parties to the transaction," captures that distinction; Noah's proposal does

not.

Second, Intuit's proposed construction also requires standardized itemization codes to

identify a preferred accounting treatment.  According to the specification, "standardized codes []

identify a preferred accounting treatment."  '435 Patent at 9:5-15.  As Noah points out, the

specification also references another patent, U.S. Patent No. 5,193,055, as an example of

"standard category codes."  Noah Brief at 42; '435 Patent at 1:21-32.  That patent assigns codes

to items identifying whether the item is an income or expense item ('055 Patent at 2:52-61), a

depreciable asset ('055 Patent at 3:14-16), an inventory item ('055 Patent at 3:17-21), or a

taxable item ('055 Patent, Fig. 2A), among other categories.  All such categories identify an

accounting treatment for the items with those codes.  Noah's proposed construction improperly

omits the requirement that the codes identify a preferred accounting treatment for the transaction.

Thus, Intuit's proposed construction should be adopted.

U.     **"second entity" (claims 35, 36, 37, 38, 43, 44, 45, 46, 47, 53)**

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| "second entity" | "Second entity" means an entity with which the first entity will enter into financial transactions, such as | The party performing a financial transaction with the first entity. |

|  | merchants, financial institutions and the like. |  |
|---|---|---|

The term "second entity" is only mentioned once in the specification of the '435 Patent, in a paragraph which mirrors the language of claim 12:

> In another embodiment of the present invention, I provide a financial accounting system including . . . a financial transaction computer for receiving data inputs including **electronically recorded financial transactions made between a first entity and a second entity**, first communication means for transferring the data inputs from the financial transaction computer to the file of the financial accounting computer, and means for providing access to the file of the financial accounting computer for the first entity and/or agents of the first entity so that the first entity and/or the agent can perform one or more activities selected from the group . . . .

'435 Patent at 2:56-67 (emphasis added).  From this use, it is clear that the term "second entity" refers to a party performing a financial transaction with the first entity.  This construction is supported by other references to the electronically recorded financial transactions performed by the first entity and another entity.  *E.g.* '435 Patent at 4:1-10 ("[S]ubsidiary ledgers are established . . . at all entities with which the first entity will enter into financial transactions . . . with financial institutions, merchants, . . . , including but not limited to automated teller machines, telephonic computers, banks . . . , investment/brokerage firms, merchants and other automated systems/record keeping devices.").  The plain meaning of the claims and specification support Intuit's simple construction.

### V.     "merchant" (claims 35, 43, 44, 45)

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| "merchant" | "Merchant" is a seller of goods. | Plain meaning. |

Merchants, like personal computers, are part of everyday life.  There is nothing to be gained by supplanting the plain meaning of the word with a particular definition.  *See Acumed*, 483 F.3d at 806.  Noah points to a single sentence in the specification in support of its

construction, "For example, in the case of a merchant, the first entity may buy an item and this financial transaction will be recorded."  Noah Brief at 43; '435 Patent at 5:47-49.  This kind of ordinary transaction is easily understood by a lay person and is not in need of any further construction.  Plain meaning is both adequate and preferred for "merchant."

### W.   "financial institution" (claims 36, 40. 43, 45, 46)

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
| --- | --- | --- |
| "financial institution" | "Financial institution" is an organization that deals with financial assets. | Plain meaning. |

Like a "financial transaction," a "financial institution" is a word with a plain meaning understood by most.  Noah does not point to a single piece of evidence, intrinsic or extrinsic, to support its proposed construction.  *See* Noah Brief at 44.  This is understandable, since the term is not defined in the specification or prosecution history.  As with the other commonly understood terms used in the claims, there is nothing to be gained by supplanting the plain meaning of the word with a particular definition.  *See Acumed*, 483 F.3d at 806.  The plain meaning of the term is the only needed explanation of the term.

### X.   "bank" (37, 41)

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
| --- | --- | --- |
| "bank" | "Bank" is a business where money is kept for savings purposes, kept for commercial purposes, invested, supplied for loans, or exchanged. | Plain meaning. |

It would be a rare juror who was not comfortable deciding whether or not a particular organization was a "bank."  Noah's proposal for "bank" mirrors that of "financial institution" – Noah cannot identify any definition for "bank" in the specification or prosecution history and thus makes one up based on the same ordinary life experience that jurors possess.  *See* Noah

Brief at 46.  As with the other commonly understood terms used in the claims, there is nothing to

be gained by supplanting the plain meaning of the word with a particular definition.  *See*

*Acumed*, 483 F.3d at 806.  The plain meaning of the term is the only needed explanation of the

term.

### Y.   "communication links between" (claim 47)

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| "communication links between" | The phrase "communication links between" means "communication connections." | Indefinite |

Intuit contends that the term "communication links between" is indefinite.  No part of the

specification or prosecution history describes the structure or operation of "communication

links."  Noah has not identified anything indicating what one of reasonable skill in the art would

understand the term "communication links between" to cover, and the limitation is therefore

indefinite.  *See Young*, 492 F.3d at 1346.

### Z.   "ledger file" (claim 53)

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| at least one ***ledger file*** on said financial accounting computer; | "Ledger file" is a computer file in the financial accounting computer containing accounts of the first entity. | A file storing accounting records for an individual or business. |

Intuit's proposed construction of "ledger file" as "[a] file storing accounting records for

an individual or business" accurately reflects the meaning attributed to that term in the industry

and the specification.  A ledger is "a book of accounts in which data from transactions recorded

in journals are posted and thereby classified and summarized."  Exhibit M at 6-15 (Barry E.

Cushing, et al, ACCOUNTING INFORMATION SYSTEMS at G-15 (Fifth Ed., Addison-Wesley 1987)).

The specification also describes various accounts and financial transactions recorded in ledgers.

*E.g.* '435 Patent at 1:48-55 (transactions); 3:26-29 (personal and business accounts); 3:66-4:10 (master and subsidiary ledgers); 4:19-35 (recording transactions in cash or accrual ledgers). Thus, the specification indicates that ledger files store the "accounting records for an individual or business" as proposed by Intuit.

There are two significant differences between the parties' proposed construction of "ledger file."  First, Noah's proposed construction unnecessarily limits the term "ledger file" to a file on the financial accounting computer.  As discussed above, the specification uses the term "ledger" irrespective of whether the ledger is a master ledger in the financial accounting computer, or a subsidiary ledger in the financial transaction computer.  *See e.g.* '435 Patent at 3:66-4:10.  Additionally, the claims themselves include language specifying the location of the ledger file, so there is no need to build that into the term "ledger file."

Second, Noah's proposed construction further limits the "ledger file" to only containing "accounts" of the first entity.  As discussed above, the specification describes ledger file storing both accounts and transactions, among other things.  *E.g.* '435 Patent at 1:48-55; 3:26-29.  Thus, Noah's construction of "ledger file" is unduly narrow and unsupported by the claims; the Court should adopt Intuit's.

### AA.   <u>"configured to receive" (claim 53)</u>

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| "configured to receive" | The ordinary meaning of "configured to receive" is "capable of receiving." | Indefinite |

Noah points to no relevant cites in either the specification or the prosecution history to support any construction for the term "configured to receive."  Noah Brief at 52.  Noah identifies two short passages in the specification dealing with the transfer of data to the subsidiary ledger on the financial transaction computer and then from the subsidiary ledger to the master ledger on

the financial accounting computer.  *Id.*  However, these passages, like the specification as a whole, do not mention what being "configured to receive" entails and how such configuration is done.  The word "configured" does not appear anywhere in the specification.  Combined with Noah's own admission that the prosecution history does not substantively discuss the limitation, the complete lack of discussion is a fatal flaw and the limitation is indefinite.

### BB.   "coupled via" (claim 53)

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| "coupled via" | The ordinary meaning of "coupled via" is "connected by." | "connected by" |

In order to streamline the claim construction process and for this purpose only, Intuit agrees that the ordinary meaning of "coupled via" is "connected by."

### CC.   "processing said data inputs" (claim 51)

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| "processing said data inputs" | The ordinary meaning of the term "processing said data inputs" is "performing operations on the data inputs." | Indefinite |

Much like the "processing . . . said financial transactions" limitation discussed above, "processing said data inputs" is indefinite.  Noah admits that "[t]he prosecution history does not include any substantive discussion" concerning the limitation.  Noah Brief at 55.  Noah identifies portions of the specification which mirror the claim language along with two additional explanations.  Noah Brief at 54-55; '435 Patent at 4:53-61 ("This access to the master ledger and subsidiary ledgers allows the agents to perform activities selected from the group consisting of entering, deleting, reviewing, adjusting and processing data inputs in the master ledger and subsidiary ledgers. This access allows agents to enter, delete, review, adjust and process data

inputs before, during and after a financial transaction in order to customize the transaction to make it fit into the accounting scheme of the individual entity."); '435 Patent at 2:3-8 ("After the data has been entered and reviewed, it would be desirable for the user to be able to choose which services are required from the system.  For example . . . obtaining tax accounting services . . . [or] a complete set of financial reports").   Although Noah seems to be arguing that "processing" in this context means either "to customize the transaction to make it fit into the accounting scheme of the individual entity," to obtain tax accounting services, or to obtain a complete set of financial reports, under any of these meanings, the limitation is indefinite.  As discussed above in section I(B), Noah must recite some identifiable algorithm to be implemented in the financial accounting computer to "process said data inputs."  Noah has failed to do so, and the limitation is indefinite.  *See Aristocrat Techs. Australia Pty. Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008; *Young*, 492 F.3d at 1346.

### DD.   "cooperates with" (claim 56)

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| wherein said financial accounting computer *cooperates with* a financial transaction computer for receiving data inputs | "The ordinary meaning of 'cooperating [sic] with' is 'communicates with'." | communicates with [a financial transaction computer] using a common language and standardized codes |

The term "cooperates with" is not mentioned anywhere in the specification or the prosecution history of the '435 Patent, and thus is indefinite.  Alternatively, Intuit proposes that the term "cooperates with" means "communicates with [a financial transaction computer] using a common language and standardized codes."  Intuit's proposed construction properly distinguishes the terms "communicates" and "cooperates" as those terms are used in the claims, and captures the true meaning of how the examiner distinguished the '435 Patent from the prior art during prosecution.  In contrast, Noah's proposed construction equates the words

"cooperates" and "communicates" despite the differing usage in the claims and ignoring the different plain meanings of those words.

This particular claim element requires the financial accounting computer to "cooperate with" a financial transaction computer for receiving data inputs. The specification describes this as the use of common language and standardized codes: "The automated accounting system preferably uses a common language in and among computer systems and/or entities to communicate processing instructions and utilize standardized codes." '435 Patent at 2:28-32. Moreover, the specification described transferring transaction information, *i.e.* data inputs, using a common language and standardized codes: "once transaction details from multiple transaction systems (e.g. credit card, check, debit card, telephone payment, electronic bill payments, etc.) are transferred to control account ledgers through the use of common language and standardized code structures within and between each of the transaction systems." *Id.* at 10:6-13. Thus, the specification described "cooperation" as the use of common language and standardized codes.

Although the term "cooperates with" does not have a common meaning in this context, various definitions are instructive. For example, the IBM Dictionary of Computing does not list "cooperate" separately, but rather, defines "cooperative application" as "a type of distributed application, in which the user interface portion of the application runs on a programmable workstation while some or all of the remaining code runs on one or more linked systems." Exhibit R at 125 (IBM Dictionary of Computing (IBM 1991). While not exactly matching the invention, this definition connotes the use of something more than mere communication to coordinate the processing between the two systems. Additionally, comparing the ordinary meaning of "cooperate . . . to work together toward a common purpose" to the ordinary meaning of "communicate . . . to transmit", the requirement for additional coordination in the form of a

common language and standardized codes in the construction of "cooperates with" is apparent. Exhibit N at 269, 293 (AMERICAN HERITAGE DICTIONARY at 269, 293 (1980)).

As discussed above, during reexamination the examiner construed the "first communication means" to require common language and standardized codes, among other things.  Notably, claim 56 requires the use of the first communication means to "transfer[] said data inputs from said financial transaction computer to said file of said financial accounting computer."  Because the term "wherein said financial accounting computer cooperates with a financial transaction computer for receiving data inputs" necessarily requires the transfer of data input from financial transaction computer to financial accounting computer, and this transfer occurs via the first communication means, this element similarly requires the use of common language and standardized codes.  Therefore, "cooperates with" means "communicates with [a financial transaction computer] using a common language and standardized codes" as proposed by Intuit.

> **EE.** __"coupled to" (claim 56)__

| Disputed Term | Noah's Proposed Construction | Intuit's Proposed Construction |
|---|---|---|
| "coupled to" | The ordinary meaning of the term "coupled to" is "connected to." | "connected for communications via" |

In order to streamline the issues for claim construction, and for only for this purpose, Intuit agrees that "coupled to" means "connected to."

## **CONCLUSION**

For the foregoing reasons, Intuit respectfully requests (1) that the asserted claims be declared invalid for failure to comply with the definiteness requirements of 35 U.S.C. § 112 ¶2, and (2) that the disputed claim limitations be construed as set forth above.

Dated: December 4, 2009

Respectfully submitted,

FENWICK & WEST LLP

By: */s/ David D. Schumann*
Michael J. Sacksteder, CA Bar No. 116623
(*pro hac vice*)
David D. Schumann, CA Bar No. 223936
(*pro hac vice*)
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Email: msacksteder@fenwick.com
           dschumann@fenwick.com
Phone: (415) 875-2300
Fax:    (415) 281-1350

Attorneys for Defendant and Counter-Plaintiff
INTUIT INC.